UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CITY OF SEATTLE, a municipal corporation,<br><br>Plaintiff<br><br>v.<br><br>MCKINSEY & CO., INC., MCKINSEY HOLDINGS, INC., MCKINSEY& COMPANY UNITED STATES, MCKINSEY & COMPANY WASHINGTON D.C.,<br><br>Defendants | No.<br><br>COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## TABLE OF CONTENTS

Page


I. INTRODUCTION ....... 1

II. PARTIES ....... 5

A. Plaintiff ....... 5

B. Defendants ....... 5

III. JURISDICTION AND VENUE ....... 6

IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ....... 7

A. Background on Opioids ....... 7

B. Aggressive and Deceptive Marketing of Prescription Opioids Fueled the Opioid Epidemic ....... 8

C. McKinsey Played an Instrumental Role in the Aggressive and Deceptive Marketing of Prescription Opioids ....... 9

1. For McKinsey, “Consulting is more than giving advice.” ....... 9

2. McKinsey’s transformative work for Purdue. ....... 11

a. Purdue pleads guilty to misbranding OxyContin and is bound by a corporate integrity agreement. ....... 11

b. Purdue hires McKinsey to boost opioid sales in the wake of its guilty plea. ....... 12

c. McKinsey delivers. ....... 16

d. McKinsey’s efforts triple OxyContin sales. ....... 29

3. McKinsey guided other opioid manufacturers. ....... 30

a. Endo ....... 30

b. Johnson & Johnson ....... 35

4. McKinsey’s work with the FDA. ....... 38

5. McKinsey was aware of the devasting effects of opioids and continued to provide marketing advice. ....... 42

6. McKinsey continued consulting to increase the sale of opioids despite the nationwide epidemic. ....... 44

7. A mea culpa. ....... 47

D. McKinsey’s Conduct Contributed to an Opioid Epidemic that has Wrought Havoc on Seattle Communities. ....... 48




HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

E. McKinsey Has Caused the City Substantial Economic Injury ..... 54
1. Public health services. ..... 54
2. Paramedic services. ..... 56
3. Policing services and criminal justice costs. ..... 56
4. Combatting homelessness. ..... 58
V. TOLLING OF STATUTES OF LIMITATIONS ..... 59
VI. CAUSES OF ACTION ..... 60
FIRST CAUSE OF ACTION: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO), 18 U.S.C. § 1961, *ET. SEQ.* ..... 60
SECOND CAUSE OF ACTION: PUBLIC NUISANCE RCW CHAPTER 7.48 ..... 94
THIRD CAUSE OF ACTION: PUBLIC NUISANCE WASHINGTON COMMON LAW ..... 96
FOURTH CAUSE OF ACTION: NEGLIGENCE ..... 97
FIFTH CAUSE OF ACTION: CIVIL CONSPIRACY ..... 98
PRAYER FOR RELIEF ..... 99
JURY DEMAND ..... 99



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## I. INTRODUCTION

1. The opioid epidemic is a public health crisis of historic proportions. It is the deadliest drug epidemic this country has ever faced. In 2021 alone, opioid overdoses killed more than 80,000 Americans, and widespread opioid abuse is devastating communities across the nation.

2. On average, nearly three Washingtonians die every day from an opioid overdose, and the rate is steadily increasing.[1] In 2021, 540 people suffered fatal opioid overdoses right here in King County.[2]

3. These deaths are attributable to a flood of prescription opioids into the region over the last two decades. Between 2006 and 2012 alone, more than 1.8 billion opioid pills were distributed in Washington, and nearly a quarter of these opioids were directed into King County. For far too many, this ready supply of prescription opioids led to a pathway of dependence, abuse, overdose, and death. For far too many, dependence on prescription drugs was a gateway to even more lethal opioids, including heroin and fentanyl. With tragic consequence, this pattern has played out in Seattle and across the nation.

4. As this crisis has evolved, Seattle has pursued a range of public health and law enforcement initiatives to combat opioid abuse and its effects. The City's efforts have saved countless lives and provided a second chance to many individuals suffering opioid addiction. But there is more work to be done. Additional resources and even more comprehensive efforts are needed to stem the tide of opioid abuse and remediate its widespread effects.

5. While this burden has fallen on Seattle, it was born from the misconduct of others who must be held accountable. In 2017, Seattle initiated a civil action against Purdue and other opioid manufacturers who deceptively marketed their drugs in Seattle and across the country. It is now apparent that these manufacturers did not act alone. They were guided by McKinsey, the world's preeminent management consulting firm.

---

[1] *See* https://adai.washington.edu/WAdata/opiate_home.htm.

[2] *See* https://kingcounty.gov/depts/health/examiner/services/reports-data/overdose.aspx.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

6. Working hand in glove with the manufacturers, McKinsey devised core components of the aggressive and deceptive marketing campaign that catalyzed the opioid epidemic. Like the manufacturers, McKinsey knew prescription opioids are highly addictive and ineffective in the treatment of long-term chronic pain, yet McKinsey formulated aggressive strategies to pump as many of these drugs as possible into our communities—all to maximize returns for the opioid manufacturers and draw handsome consulting fees.

7. McKinsey's work with opioid manufacturers dates back several decades, but it escalated in the years following Purdue's 2007 guilty plea for misleadingly marketing OxyContin—the blockbuster drug that sparked the opioid crisis. As part of the guilty plea, Purdue entered into a Corporate Integrity Agreement requiring, among other things, that Purdue disseminate only "fair and accurate" information concerning its drugs, including as to the risk of addiction.

8. Purdue's owners—the Sackler family—sensed further legal exposure on the horizon and, as internal correspondence shows, wanted to boost OxyContin sales to make Purdue a more attractive acquisition target. The Corporate Integrity Agreement presented a challenge in this regard and the Sacklers brought in McKinsey to help the company increase sales while providing a veneer of compliance with the agreement's strictures.

9. McKinsey is not a firm that provides advice at arm's length. It prides itself on learning the intimacies of its clients' businesses, embedding itself in management, and evolving "transformational partnerships" with actual boots on the ground. Such was McKinsey's relationship with Purdue. Despite knowing that prescription opioids are highly addictive and overprescribed, McKinsey rolled up its sleeves to figure out how Purdue could sell as much OxyContin as possible, whatever the consequences. And McKinsey delivered.

10. The strategy McKinsey and Purdue implemented was multifaceted, featuring at least three core components.

11. ***First***, McKinsey helped Purdue create new promotional messages that, while different from the claims that led to Purdue's 2007 guilty plea, were no less misleading. For example, to "counter emotional messages from mothers with teenagers that overdosed [on


HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

OxyContin],” McKinsey encouraged Purdue to claim that OxyContin provides “freedom” and “peace of mind” for its users, giving them “the best possible chance to live a full and active life.” There was never support for these claims, and yet, following McKinsey’s guidance, Purdue developed promotional materials that embodied them.

12. ***Second***, one key insight McKinsey provided was that Purdue’s marketing efforts were more impactful when targeted at providers that generally prescribe large quantities of opioids. It did not matter that many of these providers were over-prescribing opioids—either because they had been captured by the manufacturers’ misleading claims about the risks and efficacy of opioids, or because they were prescribing without regard to medical need. McKinsey knew that these providers, even the rogue ones, were Purdue’s most receptive audience, and McKinsey worked with Purdue to implement a system to identify and pepper them with promotional materials.

13. ***Third***, McKinsey urged Purdue to use sales quotas and bonus payments to motivate hyper aggressive sales tactics. Following McKinsey’s guidance, in 2010 Purdue implemented a four-year plan to increase the quota for annual prescriber visits by sales personnel, from 545,000 to 744,000. McKinsey also encouraged Purdue to decrease sales personnel training time to boost sales calls.

14. While McKinsey and Purdue began implementing these core strategies following Purdue’s 2007 guilty plea, efforts intensified in 2013 when the Corporate Integrity Agreement expired. Freed from those restrictions, McKinsey encouraged Purdue to implement what it called “Project Turbocharge,” under which Purdue would *double* its sales budget to spend more than $45 million a quarter just on the promotion of its drugs. Under Project Turbocharge, Purdue intensified its efforts to target high-prescribing physicians and reworked incentive programs to further catalyze its massive salesforce.

15. McKinsey’s efforts were highly impactful. Purdue’s 2007 guilty plea should have decreased OxyContin sales. But working with McKinsey, Purdue was able to triple its OxyContin revenues in the three years following the plea—from $1 billion to $3 billion—and



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Project Turbocharge stabilized Purdue's revenues in an otherwise declining market for prescription opioids.

16. Although Purdue was perhaps its marque opioid client, McKinsey also worked with other opioid manufacturers, including Endo and Johnson & Johnson. With both of these manufacturers, McKinsey implemented sales and marketing strategies akin to "Project Turbocharge" to drive revenues regardless of the human costs. And while McKinsey was advising opioid manufacturers, it was simultaneously advising the FDA on the regulatory and approval scheme governing their drugs. McKinsey never disclosed the conflict of interest to the FDA, despite a contractual obligation to do so.

17. Through these sustained efforts, McKinsey played an instrumental role in driving opioid sales across the country, and in Seattle. The story of the opioid epidemic simply cannot be told without detailing the work McKinsey did to promote opioids and overcome barriers to their wider distribution. And McKinsey did it all in knowing disregard of the tragic consequences. In the words of one former McKinsey consultant, McKinsey's work for the opioid industry was "the banality of evil, M.B.A edition." McKinsey "knew what was going on [] and they found a way to look past it, through it, around it, so as to answer the only question they cared about: how to make the client money."[3]

18. In 2019, with scrutiny mounting, McKinsey ceased advising the opioids industry and, as internal emails show, took steps to destroy evidence of its involvement. But the damage had been done, and its effects are lasting, particularly in Seattle where the opioid crisis is acute and on public display. With this action, Seattle seeks to hold McKinsey responsible for the role it played.

[3] *See* https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## II. PARTIES

### A. Plaintiff

19. Plaintiff City of Seattle ("Seattle" or "City") is a municipal corporation of the first class, organized and existing under the laws of the State of Washington, that conducts business in King County, Washington.

### B. Defendants

20. Defendant McKinsey & Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, at 80 State Street, Albany, NY 12207.

21. Defendant McKinsey Holdings, Inc. is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

22. Defendant McKinsey & Company, Inc. United States is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

23. Defendant McKinsey & Company, Inc. Washington D.C. is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

24. Upon information and belief, McKinsey & Company, Inc. is the parent company of McKinsey & Company Holdings, Inc., which is itself the parent company of both McKinsey & Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. Upon information and belief, each subsidiary corporation is wholly-owned by its parent. Despite the corporate form, McKinsey began as a partnership and still refers to its senior employees as



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

"partners." Those partners are the firm's shareholders. Collectively, these four Defendants are referenced throughout as "McKinsey."

25. McKinsey a is global management consultancy with offices in over 130 cities in 65 countries, including the following United States cities: Atlanta, GA; Austin, TX; Houston TX; Dallas, TX; San Francisco, CA; Los Angeles, CA; Redwood City, CA; Boston, MA; Charlotte, NC; Chicago, IL; Cleveland, OH; Denver, CO; Detroit, MI; Miami, FL; Miramar, FL; Tampa, FL; Minneapolis, MN; Summit, NJ; New York, NY; Philadelphia, PA; Pittsburgh, PA; Seattle, WA; St. Louis, MO; Stamford, CT; Waltham, MA; and Washington, D.C.

26. McKinsey is registered to do business in all fifty states.

## III. JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Seattle asserts federal claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"). This Court has supplemental jurisdiction over Seattle's state law claims pursuant to 28 U.S.C. § 1367 because those claims are related to Seattle's federal claims and form part of the same case or controversy.

28. This Court also has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a) because Seattle is a "citizen" of Washington, Defendants are citizen of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

29. This Court has personal jurisdiction over Defendants because at all relevant times, Defendants purposely availed themselves of the privilege of doing business in the State and in this District, including by engaging in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, that were intended to be, and were, implemented in, or whose implementation had a substantive and intended effect in this State and District, among other places. Defendants purposefully directed their activities at the State, and the claims arise out of those activities.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to Seattle's claims occurred in, were directed to, and/or emanated from this District.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. Background on Opioids

31. The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

32. The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine. Although heroin and opium are now classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

33. Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the Drug Enforcement Administration since 1970.

34. Throughout the twentieth century, pharmaceutical companies developed prescription opioids like Percodan, Percocet, and Vicodin, but these opioids were generally produced in combination with other drugs, with relatively low opioid content. Purdue's OxyContin, which launched in 1996 and catalyzed the opioid epidemic, was different. Purdue initially made it available in the following strengths: 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, 80 mg, and 160 mg. The weakest OxyContin delivers as much narcotic as the strongest Percocet, and some OxyContin tablets deliver sixteen times that.

35. OxyContin is also a "long-acting" opioid designed to be taken once or twice daily for supposed continuous 24-hour pain relief. There are now other long-acting opioids on the market, including Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian. Other opioids on the market are short-acting, such as Cephalon's Actiq and Fentora.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

36. Patients develop tolerance to opioids and, as tolerance increases, patients typically require progressively higher doses to obtain the same pain reduction and euphoric effect. However, opioids depress respiration and, at very high doses, can, and often do, arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

37. Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms can include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

## B. Aggressive and Deceptive Marketing of Prescription Opioids Fueled the Opioid Epidemic

38. Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

39. This was as true in Seattle as it was elsewhere. Dr. John Loeser, a clinical professor emeritus at University of Washington specializing in pain medicine, has explained that in the 1980s "[i]t did not enter our minds that there could be significant numbers of chronic pain patients who were successfully managed with opioids, because if there were any, we almost never saw them." Instead, providers at University of Washington's pain clinic followed "the mantra that it was not wise to treat chronic pain patients with opioids."

40. By the late 1990s, opioid manufacturers began a marketing scheme designed to persuade doctors and patients that opioids can and should be used for chronic pain, a far broader group of patients much more likely to become addicted and suffer other adverse effects from the



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

long-term use of opioids. In connection with this scheme, the manufacturers spent millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.

41. Purdue—the manufacturer of the blockbuster drug OxyContin—is generally seen as originating many of the deceptive messages used to promote opioids for chronic pain. Other manufacturers quickly followed suit, however, implementing and evolving Purdue's playbook. What was not understood, until recently, was the key role McKinsey played in all this. Working behind the scenes, McKinsey embedded itself in the opioids industry and, applying its expertise, devised many aspects of the manufacturers' deceptive and aggressive marketing scheme.

## C. McKinsey Played an Instrumental Role in the Aggressive and Deceptive Marketing of Prescription Opioids

42. To understand how deeply McKinsey is entangled in the opioid crisis, one must first understand how it operates.

### 1. For McKinsey, "Consulting is more than giving advice."

43. McKinsey is a global consulting firm with many areas of expertise, including the pharmaceutical industry. As a management consulting firm, McKinsey provides plans to managers, directors, and owners on how to run their companies, and helps implement those plans.

44. Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad range of activities, and the many firms and their members often define these practices quite differently."[4]

45. Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and

[4] Arthur Turner, *Consulting is More Than Giving Advice*, HARVARD BUSINESS REVIEW (Sept. 1982), available at https://hbr.org/1982/09/consulting-is-more-than-giving-advice.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

mergers and acquisitions. The strategy consultant provides a plan to the client that the client may choose to adopt or not.

46. "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains embedded with the client to perform the necessary work and execute on the plan.

47. Implementation services are a core component of the suite of services McKinsey offers clients, including pharmaceutical companies. During the implementation phase, McKinsey essentially bonds with the client. Describing McKinsey's approach to implementation, one McKinsey consultant stated, "In some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we are working that cohesively together."[5]

48. Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[6]

49. According to McKinsey promotional materials:

> The reason McKinsey implementation works is because clients love it. The fact that we are staying longer with them, the fact that we're getting into the trenches, the fact that we are there to walk the emotional journey with them when they're going through the tough times and really changing their companies, is what makes McKinsey implementation truly distinctive.[7]

50. McKinsey has long touted the notion of a "transformational relationship." It is the goal of every client relationship McKinsey develops and, McKinsey claims, the best way to

---

[5] McKinsey & Co., *McKinsey on Implementation* (Apr. 30, 2017), https://www.youtube.com/watch?v=rEQOGVpl9CY.

[6] *Id.*

[7] *See* McKinsey & Co., *McKinsey Careers: what's behind McKinsey Implementation's logo and success?* (Oct. 22, 2018), https://web.archive.org/web/20200419140214/https://www.youtube.com/watch?v=3-Zx859VJtw.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

extract value from a client's use of McKinsey's services. McKinsey is not a one-off seller of advice. Rather, McKinsey believes that real value for the client derives from an ongoing "transformational" relationship with the firm.[8]

51. At its core, the "transformational relationship" is *long-term*. As McKinsey puts it, "[w]e insinuate ourselves," as McKinsey's then-managing partner told *Forbes* in 1987.[9] "They have follow-on work not just because they're good at what they do, but because they are trained in how to manage these kinds of client relationships. They understand that the core reality is the relationship and the conversation, and that any particular engagement is merely epiphenomenal," explained Alan Kantrow, formerly the editor of *McKinsey Quarterly*.[10]

52. This strategy of weaving itself into all aspects of its clients' business proved enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its consultants to take with clients to great effect:

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players in the world, McKinsey rarely left, ensuring a steady and growing flow of billings for years if not decades. In 2002, for example, *BusinessWeek* noted that at that moment, the firm had served four hundred clients for fifteen years or more.[11]

**2. McKinsey's transformative work for Purdue.**

53. McKinsey began working with Purdue as early as 2003, and the relationship deepened over the ensuing decades. Much of Purdue's mismarketing of opioids can be traced to McKinsey's guidance.

**a. Purdue pleads guilty to misbranding OxyContin and is bound by a corporate integrity agreement.**

54. On May 10, 2007, the Purdue Frederick Company, Purdue's parent, as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various

---

[8] Duff McDonald, *The Firm*, Pg. 136-37 ("McKinsey no longer pitched itself as a project-to-project firm; from this point forth [the late 1970s], it sold itself to clients as an ongoing prodder of change, the kind a smart CEO would keep around indefinitely.").

[9] John Merwin, *We Don't Learn from Our Clients, We Learn from Each Other*, FORBES (Oct. 19, 1987).

[10] Duff McDonald, *The Firm*, Pg. 185.

[11] *Id.* at pg. 136.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq*. Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

55. Concurrent with the guilty plea, Purdue entered into a Corporate Integrity Agreement with the Office of Inspector General of HHS on May 7, 2007. Purdue's compliance obligations under the Corporate Integrity Agreement ran for a period of five years, expiring on May 10, 2012.

56. Pursuant to the Corporate Integrity Agreement, Purdue was obligated to implement written policies regarding its compliance program, including as to:

> selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate … including, but not limited to information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;
>
> compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products;
>
> the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from HCP's [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products, including the form and content of Materials disseminated by sales representatives, and the internal review process for the Materials and information disseminated by sales representatives.

57. Purdue was obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the Corporate Integrity Agreement, and to file compliance reports on an annual basis with the inspector general.

**b. Purdue hires McKinsey to boost opioid sales in the wake of its guilty plea.**

58. The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sackler family members occupied either



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

six or seven of the seats on Purdue's board of directors, and at all times held a majority of board seats. To advise the board of directors of Purdue was to advise the Sackler family. The interests of the Sackler family and the Purdue board of directors, and Purdue itself, as a privately held company, are all aligned. Practically, they are indistinguishable.[12]

59. After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business. Just ten days after the guilty plea was announced, David Sackler told his father and uncle (among others): "We will be sued."

Message

**From:** David Sackler [redacted]
**Sent:** 5/17/2007 11:08:08 PM
**To:** 'Sackler, Jonathan' [redacted] Sackler, Dr Richard [redacted]
**CC:** Ives, Stephen A. [redacted]
**Subject:** RE: Idea
**Attachments:** image001.jpg

Well I hope you're right, and under logical circumstances I'd agree with you, but we're living in America. This is the land of the free and the home of the blameless. We will be sued. Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us.

Around the same time, Richard Sackler, then the co-chairman of the board of directors along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was "a dangerous concentration of risk." Richard Sackler recommended a strategy of installing a loyal CEO who would safeguard the interests of the Sackler family, while at the same time positioning Purdue for an eventual sale by maximizing OxyContin sales. In the event that a purchaser for Purdue could not be found, Richard indicated Purdue should distribute more cash flow to the Sacklers.

60. By 2017, with the hope for any acquisition now gone, the Sacklers' continued to milk the company of its opioid profits. In fact, in the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue as possible: $300

---

[12] Craig Landau ("Landau"), soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO of the company, in other words, understood that he would have little practical power despite his new title. The owners ran the business.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

million. That amount was required to be retained by Purdue pursuant to a partnership agreement with a separate company. Otherwise, all the money was distributed to the owners.[13]

61. Concurrently, the Sacklers backed away from the company. During the ongoing investigation that resulted in the 2007 guilty pleas, "several family members who worked at Purdue stepped back from their operational roles."[14] In 2003, Richard Sackler himself resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler exited their roles as senior vice presidents. Mortimer D.A. Sackler quit being a vice president. They all remained on the board of directors, however.

62. As they sought to distance themselves, the Sacklers faced a fundamental problem: how to grow OxyContin sales as dramatically as possible, so as to make Purdue an attractive acquisition target, while at the same time appearing to comply with the Corporate Integrity Agreement.[15] Given the tension between compliance with the Corporate Integrity Agreement and the desire to sell more OxyContin, Purdue needed help, and it brought in McKinsey for the job.

63. Ethan Rasiel, a former McKinsey consultant, has described the typical way McKinsey begins working with a client: "An organization has a problem that they cannot solve with their internal resources. That's the most classic way that McKinsey is brought in."[16]

64. Such was the case with Purdue. Because it did not have the requisite expertise to address the problems posed by the Corporate Integrity Agreement internally, Purdue hired McKinsey to devise a sales and marketing strategy to increase opioid sales despite the Corporate

---

[13] *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, WALL ST. J. (June 30, 2019), https://www.wsj.com/articles/purdue-pharma-grapples-with-internal- challenges-as-opioid-lawsuits-mount-11561887120.

[14] Barry Meier, *Pain Killer* 167 (2018).

[15] As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change – the way the sales force was managed and incentivized, everything stayed the same." David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[16] CNBC, *How McKinsey Became One of the Most Powerful Companies in the World* (June 6, 2019), https://www.youtube.com/watch?v=BBmmMj_maII.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Integrity Agreement and growing concern about the risks that Purdue's business of selling opioids posed to its owners.

65. Purdue's Executive Committee discussed CEO Stewart's concerns regarding the constraints posed by the Corporate Integrity Agreement on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin. In June 2009, McKinsey advised Purdue senior management, including Landau, then the Chief Medical Officer ("CMO") and future CEO, regarding a variety of strategies to increase Purdue's opioid sales that were developed using McKinsey's expertise and proprietary approaches to problem solving.

66. The Sacklers hand-appointed (and loyal) CEO, John Stewart, was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey, and required his personal approval for any work orders with McKinsey.

67. In addition, Purdue's Vice President of Corporate Compliance, "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in the [Corporate Integrity Agreement]," reported directly to Stewart.

68. Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue board of directors, controlled by the Sackler family.

69. McKinsey would also work in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia ("Gasdia"), Vice President of Sales and Marketing.

70. From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate their sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the creation of an OxyContin sales strategy, but also its implementation.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**c. McKinsey delivers.**

71. McKinsey devised and assisted Purdue in executing at least the following strategies to drive OxyContin sales—all in knowing disregard of the addiction and human suffering they would generate.

**(1) Granular growth.**

72. In order to identify growth opportunities for a client, McKinsey espouses a "granular" approach whereby it mines a client's existing business to identify pockets where sales can expand. In August 2008, McKinsey Directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter: The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance (2008). "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[17]

73. Previously, in an article in the McKinsey Quarterly (coincidentally published the same month that Purdue pled guilty), the authors explained:

> Our research on revenue growth of large companies suggest that executives should 'de-average' their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[18]

74. Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[19]

75. One can imagine this strategy applied to a seller of, say, cartons of milk. If McKinsey were to perform an analysis of a milk seller's business and discover that the profit margin on milk cartons sold to cafeterias in dairy-producing states is much greater than the

---

[17] McKinsey & Co., Book excerpt, *The granularity of growth* (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

[18] Mehrdad Baghai et al., *The granularity of growth*, MCKINSEY Q. (May 1,2007), https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth.

[19] *Id.*



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

margin on cartons sold at convenience stores in the southwest, and further that the milk seller has previously devoted equal amounts of time and resources selling to both cafeterias and convenience stores, then McKinsey would likely advise the client to deploy additional resources towards selling milk to the cafeterias in dairy-producing states. McKinsey's "granular" approach to the milk seller's business channels has identified a way to increase higher margin sales, leading to new growth for the client.

76. Rather than milk, McKinsey deployed this strategy on OxyContin, a controlled substance, after its manufacturer pled guilty to misrepresenting the addictive and deadly properties of the drug.

77. McKinsey's granular analysis of Purdue's OxyContin sales efforts led to the implementation of a number of strategies to sell more pills.

78. By January 2010, McKinsey informed Purdue that, in accordance with the tenants of its granular growth analysis, Purdue could generate "$200,000,000 to $400,000,000" in additional annual sales of OxyContin by implementing McKinsey's strategies.

79. In June of 2012, Stewart assigned McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales."

80. This McKinsey did in excruciatingly granular detail, analyzing each sales channel for Purdue's opioids for weaknesses and opportunities. For instance, McKinsey informed the Sacklers that "deep examination of Purdue's available marketing purchasing data shows that Walgreens has reduced its units by 18%." Further, "the Walgreens data also shows significant impact on higher OxyContin doses." In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers.[20]

---

[20] *See* Master Complaint at ¶ 271, *In Re: McKinsey & Co., Inc., Nat'l Prescription Opiate Consultant Litig.*, 21-md-2996 (N.D. Cal. Dec. 6, 2021), ECF No. 296 (hereafter "Master Complaint").



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

81. The themes of McKinsey's work would be crystallized in a series of presentations and updates made to the Sackler family and Purdue's board of directors in the summer of 2013 entitled "Identifying Granular Growth Opportunities for OxyContin."

**(2) Marketing – countering emotional messages.**

82. In June of 2009, McKinsey teamed with Purdue's CMO (and current CEO) Landau and his staff to discuss how best to "counter emotional messages from mothers with teenagers that overdosed in [sic] OxyContin."

83. Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, while also reducing stress and isolation.

84. These marketing claims were tailored to avoid any pitfalls that the Corporate Integrity Agreement might hold. While nonetheless false and misleading, these claims regarding "freedom" and "peace of mind" were narrowly tailored to avoid representations regarding "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in Section III.B.2.c of the Corporate Integrity Agreement.

85. Purdue's marketing materials from that time period are illustrative of the approach:[21]

[21] *See* Master Complaint at ¶ 186.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594




86. In addition, McKinsey suggested the tactic of "patient pushback," wherein McKinsey and Purdue would foment patients to directly lobby their doctors for OxyContin when those physicians expressed reservations regarding the administration of Purdue's opioids.

**(3) Targeting – selling more OxyContin to existing high prescribers.**

87. Perhaps the key guidance McKinsey provided was to utilize its "granular" approach to identify historically large prescribers and direct even more sales and marketing resources to them.

88. On January 20, 2010, Purdue's board of directors was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those that had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz to encourage even further prescribing.

89. Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

90. Many of the historically highest prescribers of OxyContin – those same individuals that McKinsey urged Purdue to target for ever more prescriptions – had prescribed Purdue's OxyContin ***before*** the 2007 guilty plea, and had already been influenced by Purdue's misrepresentations regarding OxyContin that were the subject of that guilty plea. McKinsey identified these physicians – those that had already been influenced by Purdue's misrepresentations and were thus already high prescribers – as optimal targets for a massive marketing push to sell more OxyContin. Other high prescribers were doctors dispensing opioid prescriptions without regard to medical necessity.

91. McKinsey worked assiduously with Purdue over many years to target these high-risk prescribers, even though many of the additional prescriptions generated through this approach were destined to end up in the illicit market. While McKinsey disregarded the risks of this approach, it built out analytics with exacting detail, writing for example:

> The average prescriber in decile 5-10 [the top half of prescribers by volume] writes 25 times as many OxyContin scripts as a prescriber in decile 0-4. In Q1 2013 the majority (52%) of OxyContin primary calls were made to decile 0-4 prescribers. Including the secondary calls, 57% of the primary detail equivalents (PDEs) were made to decile 0-4 prescribers. Best practice in the industry is over 80% of effort on higher value prescribers.[22]

92. Working with McKinsey and the analytics it provided, Purdue instructed each sales representative to identity the "SuperCore" prescribers in their region—essentially, the top ten prescribers—and visit them twice a month.[23]

93. Later, Purdue's board of directors discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline in "tablets per Rx." In order to assure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."[24]

---

[22] *See* Master Complaint at ¶¶ 61–62.

[23] *See id.* ¶ 262.

[24] *Id.* ¶ 201.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

94. McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers, and urged Purdue and the Sacklers to "make a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.[25]

95. McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write.

96. By November 2013, McKinsey had obtained the physician-level data they had previously requested, and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them. The Purdue board of directors was kept apprised of McKinsey's progress.

**(4) Titration – selling higher doses of OxyContin.**

97. McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profits for Purdue. Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

98. Consistent with its granular growth analysis, as early as October 26, 2010, McKinsey advised the Sacklers and the Purdue board of directors that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.[26]

99. McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013, that Purdue had identified weakness in prescribing rates among the higher doses of OxyContin, and reassured the Sacklers that "McKinsey would analyze the data down to the level

[25] *Id.* ¶ 202.

[26] *Id.* ¶ 209.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.[27]

100. Purdue implemented McKinsey's suggestions by adopting the marketing slogan "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

**(5) Sales quotas and incentive compensation.**

101. McKinsey urged the use of quotas and bonus payments to motivate the sales force to sell as many OxyContin prescriptions as possible.

102. Notably, this tactic was addressed in the 2007 Corporate Integrity Agreement, which required Purdue to implement written policies regarding "compensation (including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products."

103. By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy, to dramatically increase the quota of required annual sales visits by Purdue sales representatives. The quota was 545,000 visits in 2010; 712,000 visits in 2011; 752,000 in 2012; and 744,000 visits in 2013.[28]

104. On August 8, 2013, as part of their "Identifying Granular Growth Opportunities for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal (e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."[29] McKinsey also urged that, in addition to increasing the focus of the sales force on the top prescribers, Purdue should also increase the overall quotas for sales visits for individual sales representatives from 1,400 to 1,700 annually.[30]

---

[27] *Id.* ¶ 210.

[28] *Id.* ¶ 218.

[29] *Id.* ¶ 219.

[30] *Id.* ¶ 220.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

105. In 2013, McKinsey identified one way that Purdue could squeeze more productivity out of its sales force: by slashing ***one third*** of the time that Purdue devoted to training its sales force (from 17.5 days per year to 11.5 days):[31]

**One possible way to attain benchmark ~1500 calls per year is to decrease training days by ~6 days and increase calls per day by 5%**

One possible route to benchmark

**Current call activity**

**Number of "on territory" days per year**

| **Item** | **Days[1]** |
|---|---|
| Number of working days | 260 |
| Holidays | -11.3 |
| Vacation and other time off | -27.2 |
| Trainings and meetings | -17.5 |
| Other company-related time off of field | -4.3 |
| **Total days** | 199.7 |
| **Avg calls per day** | x 7 |
| **Total calls per year** | 1398 |

**Potential new allocation**

**Number of "on territory" days per year**

| **Item** | **Days[1]** |
|---|---|
| Number of working days | 260 |
| Holidays | -11.3 |
| Vacation and other time off | -27.2 |
| Trainings and meetings | -11.5 |
| Other company-related time off of field | -4.3 |
| **Total days** | 205.7 |
| **Avg calls per day** | x 7.35 |
| **Total calls per year** | 1512 |

1 Purdue 2012 Actual data was used for this analysis

SOURCE: Purdue; team analysis

McKinsey & Company | 59

106. By eliminating one third of the time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of physical calls per day out of its now less-trained sales force.

107. Additionally, McKinsey advised Purdue on how to craft incentive compensation for the sales representatives, who were Covered Persons pursuant to the Corporate Integrity Agreement. McKinsey knew that, combined with sales quotas and less training for the sales force, bonus/incentive compensation structures tied to OxyContin sales could be a powerful driver of incremental OxyContin sales.

[31] *Id.* ¶ 221.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**(6) Increasing the overall size of the opioid market: the larger the pie, the larger the slice.**

108. Consistent with McKinsey's mandate, Purdue incentivized its sales staff "to increase not just sales of OxyContin but also generic versions of extended release oxycodone."[32] Typically, one would not wish to encourage the sales of generic competitors that offer a similar product to your own. If, however, your goal is to make a company an attractive acquisition target, the growth of the overall opioid market is just as important as one's own market share: "Whereas pharma salespeople are usually compensated based on their ability to grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall market."[33]

109. Notably, this notion that the size of a company's market share is not as important as the size of the ***overall*** market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities.

110. In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[34] "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with the HHS.[35] McKinsey designed this plan.[36]

---

[32] *Id.* ¶ 422.

[33] *See* Crow, *supra* note 15.

[34] *See* Crow, *supra* note 15.

[35] *Id.*

[36] Worth noting is that this strategy of increasing overall opioid sales directly benefitted the Sacklers through their ownership of generic manufacturer Rhodes. In addition, this strategy benefitted McKinsey's other opioid clients, such as Johnson and Johnson. "They have a huge amount of inside information, which raises serious conflict issues at multiple levels," stated a former consultant, referring to McKinsey's influential role as advisor to multiple participants in a given industry, such as opioid manufacturing. It "puts them in a kind of oligarchic position." Michelle Celarier, *The Story McKinsey Didn't Want Written*, INSTITUTIONAL INV. (July 8, 2019), https://www.institutionalinvestor.com/article/b1g5zjdcr97k2y/The-Story-McKinsey-Didn-t-Want-Written.

For example, in an August 15, 2013 presentation to Purdue management entitled "Identifying OxyContin Growth Opportunities," McKinsey noted that "McKinsey's knowledge ***of the ways other pharma companies operate*** suggests Purdue should reassess the roles of MSL and HECON Groups – and further drive the salesforce to be more responsive to formulary coverage changes." (emphasis added).



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**(7) Skirting the Corporate Integrity Agreement.**

111. During the time that McKinsey was advising Purdue, Purdue deliberately minimized the importance of the Corporate Integrity Agreement. On information and belief, McKinsey provided guidance and strategies that were used to this end.

112. One Purdue sales representative who joined the company during McKinsey's involvement stated that Purdue's 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, 'we were sued, they accused us of mis-marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine.' You had the impression they were portraying it as a bit of a witch hunt."[37] (Purdue and its executives paid $634.5 million in fines.)

113. Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to sell OxyContin to doctors while at the same time maintaining ostensible compliance with the Corporate Integrity Agreement. One Purdue sales representative stated, for example, that while she was told she could not flatly claim that OxyContin was better or safer than other opioids, "she was trained to talk about products in ways that implied that it was safer." She might tout OxyContin's 12-hour formulation to a prescriber. "You could say that with a shorter-acting medication that wears off after six hours, there was a greater chance the patient was going to jump their dosing schedule and take an extra one a little earlier. We couldn't say [it was safer], but I remember we were told that doctors are smart people, they're not stupid, they'll understand, they can read between the lines."[38]

**(8) Project turbocharge.**

114. In 2013, the year after the Corporate Integrity Agreement expired, McKinsey urged a number of transformational sales and marketing tactics that would further boost OxyContin sales. McKinsey described these tactics to the Purdue board of directors in a series of

---

[37] *See* Crow, *supra* note 15.

[38] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

updates entitled "Identifying Granular Growth Opportunities for OxyContin" in July and August of 2013.

115. McKinsey dubbed their overall sales and marketing strategy for Purdue "Project Turbocharge," and urged the Sackler family and the board of directors to adopt it.

116. The Sacklers were impressed with McKinsey's work. On August 15, 2013, Richard Sackler emailed Mortimer D.A. Sackler, "the discoveries of McKinsey are astonishing."[39]

117. Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family – not the Purdue board of directors – in order to pitch Project Turbocharge. Dr. Arnab Ghatak ("Ghatak"), one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner Martin Elling ("Elling") in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] … We went through exhibit by exhibit for about 2 hrs … They were extremely supportive of the findings and our recommendations … and wanted to strongly endorse getting going on our recommendations."[40]

118. Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"[41]

119. As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and re-christened the initiative the more anodyne "E2E: Evolve to Excellence."[42]

---

[39] *See* Master Complaint at ¶ 241.

[40] *Id.* ¶ 242.

[41] *Id.* ¶ 243.

[42] Regarding the name change, CEO Stewart wrote to McKinsey partners Rosiello and Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive 'turbocharge' process – ***though we do need to find a better and more permanently appropriate name***." (emphasis added).



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

120. Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales Meeting.

121. CEO Stewart also told sales staff that board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process," referring to McKinsey's plan.[43]

122. After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Gasdia during Purdue's implementation of McKinsey's recommendations.

123. In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

124. At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board of directors discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

125. McKinsey's Project Turbocharge, now re-named Evolve to Excellence, called for a doubling of Purdue's sales budget. Under McKinsey's prior guidance, Purdue's promotional spending had already skyrocketed. McKinsey's influence on Purdue's operations after the 2007 guilty plea is stark:

[43] *Id.* ¶ 246.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594




126. At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project Turbocharge had been implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million per quarter, an increase of ***800%***.[44]

127. Project Turbocharge continued despite the arrival of a new CEO at Purdue. On January 17, 2014, new CEO Mark Timney received reports from McKinsey emphasizing that, in order to increase profits, Purdue must again increase the number of sales visits to "high-value" prescribers, i.e., those that prescribe the most OxyContin.[45]

128. McKinsey also urged, consistent with their granular approach, that sales representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling Butrans, another Purdue product. Previously, the split had been fifty-fifty. Purdue implemented McKinsey's suggestion.

---

[44] *Id.* ¶ 251.

[45] *See id.* ¶ 252.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**d. McKinsey's efforts triple OxyContin sales.**

129. Purdue got what it wanted out of McKinsey. Between the years of 2008 through 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million distributed in 2010 alone.[46]

130. These distributions would not have been possible without the McKinsey's work dramatically increasing OxyContin sales.

131. The Sacklers were aware of the value McKinsey provided: on December 2, 2013, CEO Stewart informed Kathe Sackler and Vice President of Sales and Marketing Gasdia that Project Turbocharge "was already increasing prescriptions and revenue." Crucially, these results were already being realized before the strategy was fully deployed as the theme of the 2014 National Sales Meeting.[47]

132. McKinsey's contributions to Purdue's growth after 2007 are remarkable. OxyContin sales should have naturally declined: the Department of Justice identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of HHS entered into a Corporate Integrity Agreement whereby Purdue was monitored to assure that those sales did not continue.

133. In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.[48]

134. The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion: a tripling of revenue from OxyContin sales.[49]

---

[46] *Id.* ¶ 277.

[47] *Id.* ¶ 279.

[48] *See* Crow, *supra* note 15.

[49] *Id.*



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

135. Under McKinsey's guidance, OxyContin sales would reach their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[50] That OxyContin sales peaked in 2013 is especially notable, given that overall opioid prescriptions had already peaked three years earlier, in 2010.[51] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

136. By 2018, with OxyContin sales in their inexorable decline, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The ranks of sales representatives were cut back to 200 people – the approximate size of Purdue's sales staff prior to the initial launch of OxyContin.

137. In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater than 60 milligrams per day.[52]

### 3. McKinsey guided other opioid manufacturers.

138. While McKinsey's work for Purdue has drawn the most scrutiny, McKinsey applied the same tactics to drive opioid sales for other manufacturers in the industry, including Endo and Johnson & Johnson.

#### a. Endo

139. While McKinsey was working for Purdue, McKinsey was also working for Endo Pharmaceuticals. Arnab Ghatak was a principal McKinsey partner on both accounts at the same time. There was additional overlap between the McKinsey teams staffed to Purdue and Endo, including McKinsey partners Nicholas Mills and Laura Moran.

140. Like Purdue, Endo was historically a pharmaceutical manufacturer focused on the pain market. Like Purdue, Endo relied on opioid sales for a significant portion of its business. As

---

[50] Phil McCausland & Tracy Connor, *OxyContin maker Purdue to stop promoting opioids in light of epidemic*, NBC NEWS (Feb. 10, 2018), https://www.nbcnews.com/storyline/americas-heroin- epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726.

[51] Gery P. Guy Jr, et al., *Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015*, 66 MORB. MORTAL WKLY. REP. 697–704 (July 7, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.

[52] *See* Master Complaint at ¶ 287.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

a matter of fact, Endo's history with opioids predates the Sacklers' ownership of Purdue. In 1950, Endo's predecessor, Intravenous Products of America, Inc., launched Percodan, an Oxycodone/Aspirin tablet. In 1971, Endo, then owned by E.I. du Pont de Nemours and Company ("DuPont"), launched Percocet, another oxycodone-based tablet.[53]

141. Endo's first oxymorphone product, Numorphan, was commonly referred to as "blues" after the color of the 10mg pills, and widely abused. It delivered a more euphoric high than heroin, according to some. In 1974, the National Institute on Drug Abuse noted in its "Drugs and Addict Lifestyle" report that Numorphan was popular as an abused drug for its quick and sustained effect.[54] By 1979, Endo withdrew Numorphan from the market amid abuse concerns.

142. With the launch of Opana in 2006, Endo went back to the same playbook and aggressively marketed the new drug for chronic pain. But Opana was new in name only. It was an oxymorphone product just like the Numorphan or "blues" removed from the market previously, and no less dangerous. Opana was likewise a sales success. By 2012, opioid sales accounted for approximately $403 million of Endo's $3 billion in revenue, more than 10%. From 2010 to 2013, total Opana ER revenue alone exceeded $1.1 billion.

143. In addition to its branded products, Endo, through subsidiaries Qualitest Pharmaceuticals, Inc. and, after its acquisition in 2015, Par Pharmaceuticals, also manufactured generic versions of oxycodone, oxymorphone, hydromorphone, and hydrocodone.

144. Over the course of McKinsey's relationship with Endo, McKinsey would repeatedly advise Endo how to maximize its generics business in addition to sales of Endo's branded opioids.

145. McKinsey's earliest known work with Endo concerned the launch of Opana in Europe, but its relationship with Endo would expand to encompass all aspects of Endo's

---

[53] Endo, *Our Story*, https://www.endo.com/about-us/history#fragment-25 (last accessed October 28, 2022).

[54] John Fauber & Kristina Fiore, *Abandoned Painkiller Makes a Comeback*, MEDPAGE TODAY (May 10, 2015), available at https://www.medpagetoday.com/psychiatry/addictions/51448.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

business, including corporate organization and resource allocation, the launch of a new branded Buprenorphine product, and sales force optimization efforts for Endo's branded and generic opioid products.

146. In some ways, the McKinsey's relationship with Endo was even more tightknit than with Purdue. For instance, no one at Purdue previously worked for McKinsey. In early 2013, Rajiv de Silva, previously a leader of McKinsey's PMP group, was appointed CEO of Endo. At Endo, McKinsey was now advising one of its previous senior partners.[55]

147. Under de Silva, Endo relied more heavily on McKinsey than ever. McKinsey consultants interacted directly with de Silva, maintaining weekly performance review meetings with de Silva and senior Endo management. In these meetings, granular weekly sales data was reviewed for each of Endo's branded products, including Opana.[56] The objective of these meetings, and McKinsey's entire engagement, was to sell as many of Endo's opioids as possible, regardless of the consequences.

**(1) Opana**

148. Within a few years of Opana's introduction, the opioid was widely abused. Working with McKinsey, Endo developed a reformulated version of Opana with a coating that could be marketed as crush-resistant and thus tamperproof. This was a sham from the outset.

149. In December 2011, Endo obtained FDA approval for a new formulation of Opana ER with the coating that Endo claimed was crush-resistant. The following month, however, the FDA told Endo that it could not market Opana ER, even after the reformulation, as abuse deterrent. The FDA found that such promotional claims "may provide a false sense of security since the product may be chewed and ground for subsequent abuse."[57] In other words, Opana ER was still crushable. In December 2011, Endo admitted that "[i]t has not been established that this

---

[55] *See* Endo Press Release, *Rajiv De Silva Named President and CEO of Endo Health Solutions* (Feb. 25, 2013), available at https://investor.endo.com/news-releases/news-release-details/rajiv-de-silva-named-president-and-ceo-endo-health-solutions ("Earlier in his career, he was a Principal at McKinsey & Company, where he served as a member of the partnership group that led the global Pharmaceuticals and Medical Products practice.").

[56] *See* Master Complaint at ¶ 308.

[57] *Id.* ¶ 318.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

new formulation of Opana ER is less subject to misuse, abuse, diversion, overdose, or addiction."[58] Moreover, the regulated version of Opana could readily be heated and injected, and thus many Opana users already dependent on the drug began using needles for the first time.

150. Even though the reformulated Opana ER was not tamperproof, and despite the FDA's prohibition on making such claims, Endo training modules directed key opinion leaders to instruct prescribers that Opana ER is the only oxymorphone designed to be "crush-resistant," and advised the key opinion leaders to state during their speeches that "[t]he only way for your patients to receive oxymorphone ER in a formulation designed to be crush-resistant is to prescribe OPANA ER with INTAC." The speakers were advised to stress that generic versions of Oxymorphone "are not designed to be crush-resistant."[59]

151. And while Endo was working with McKinsey to mismarket the reformulated Opana as being abuse-deterrent, Endo continued to market the original formulation of Opana that lacked the (albeit overstated) safeguards of the reformulation. Plainly, the objective was not to market safer drugs; it was to sell as many opioids as possible.

**(2) Belbuca**

152. Working with McKinsey, Endo likewise marketed its drug Belbuca—a buprenorphine product—as being less addictive than other opioids. But those "other opioids"—the dangerous ones—were in fact opioid products that McKinsey was working tirelessly to sell, including Purdue's OxyContin.

153. For example, on August 13, 2015, McKinsey's Craig MacKenzie circulated a discussion document to Endo and McKinsey staff entitled "Belbuca value proposition," which laid out McKinsey's thoughts on how to differentiate Endo's buprenorphine product from other opioids in the marketplace. One point of differentiation McKinsey noted was that OxyContin was commonly abused, while Endo's Belbuca hopefully would not be:[60]

---

[58] Decl. of Maureen L. Rurka at Ex. A, *Endo Pharms. Inc. v. U.S. Food & Drug Admin.*, No. 1:12-cv-01936 Doc. 18-2 (D.D.C. Dec. 9, 2012), ECF No. 18-2.

[59] *See* Master Complaint at ¶ 319.

[60] *Id.* ¶ 339.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594




154. McKinsey also devised a plan for Belbuca to be marketed as a means of transitioning users of short-acting opioids to the more commonly abused long-acting opioids. As part of this strategy, McKinsey advised Endo on how to build out a narrative needed to implement this marketing strategy. And the objective was also not simply to transition users to Belbuca, or other buprenorphine products that Endo claimed to be safer—but also to other long-acting opioids (like Endo's own Opana ER).[61]




[61] *Id.* ¶ 347.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

155. McKinsey knew that transitioning short-term opioid users to long-acting opioids leads to addiction. McKinsey's own documents describe the "opioids dependence treatment pathway" as follows:[62]




**b. Johnson & Johnson**

156. McKinsey also working with Johnson & Johnson, which occupied multiple roles within the opioids industry. Through its subsidiary, Janssen Pharmaceuticals ("Janssen"), Johnson & Johnson marketed and sold branded opioid products, including Duragesic (a transdermal fentanyl patch) and Nucynta (tramadol tablets and oral solution). Through its Noramco and Tasmanian Alkaloids subsidiaries, Johnson & Johnson farmed the poppy plant in New Zealand and created the precursor chemical and raw materials necessary to manufacture *all* opioids. Noramco and Tasmanian Alkaloids sold these raw materials to the other opioid manufacturers: Purdue, Endo, Mallinckrodt, and others. Johnson & Johnson was thus critical to the entire opioids supply chain.

---

[62] *Id.* ¶ 349.


HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

157. McKinsey worked with Johnson & Johnson for decades, with McKinsey alumni taking positions at Johnson and Johnson, and vice versa. Janssen's current Director of Customer Marketing & Value Based Care was hired from McKinsey's pharmaceuticals group. The relationship flowed both ways: Janssen's former Vice President of Sales and Marketing for Janssen Pharmaceuticals is currently a McKinsey partner. Moreover, Ian Davis has been an independent director since 2010 and currently sits on the Audit and Regulatory Compliance committees of Johnson & Johnson's board. Previously, he was a Senior Partner at McKinsey, "having served as Chairman and Worldwide Managing Director from 2003 until 2009."[63]

158. McKinsey advised Johnson & Johnson in several areas critical to its opioids line of business. For example, McKinsey provided guidance with respect to Johnson & Johnson's Noramco operations, through which Johnson & Johnson harvested the poppy plants necessary to manufacture opioids across the industry.

159. McKinsey was also instrumental in the success of Janssen's drug Duragesic, a transdermal patch that administers fentanyl. As one commentator has observed, "Duragesic proved to be one of the most successful analgesic pharmaceutical products ever developed, with sales in 2004 (its last year of patent life) exceeding $2.4 billion. The success of the fentanyl patch caused many generic companies to produce equivalents once it went off patent."[64]

160. As early as 2002, McKinsey was advising Johnson & Johnson regarding methods to boost sales of its opioids. For example, on March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson's subsidiary Janssen regarding how to market their opioid Duragesic. One of the recommendations McKinsey provided to Johnson & Johnson was that they

---

[63] Johnson & Johnson, *Our Leadership Team: Ian E. L. Davis*, https://www.jnj.com/leadership/ian-e-l-davis (last accessed October 28, 2022).

[64] Theodore Stanley, *The Fentanyl Story*, 15 J. OF PAIN 1215–1226, 1220 (Dec. 2014), available at https://www.jpain.org/article/S1526-5900(14)00905-5/pdf.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

concentrate their sales and marketing efforts on doctors that were *already* prescribing large amounts of Purdue's OxyContin.[65]

161. In other words, as early as 2002, McKinsey had such intricate knowledge of the sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with OxyContin specifically, that it was able to recommend to *a competitor of Purdue* that it boost its own opioid sales by following in the footsteps of Purdue. McKinsey also advised Johnson & Johnson to target Duragesic on "high abuse risk patients (e.g., males under 40)." This targeting would take advantage of the marketing claim that Duragesic "was harder to abuse than other opioids on the market."[66]

162. In addition, even before McKinsey was advising Purdue on how to "turbocharge" its opioid sales, it was implementing the same strategies with Johnson & Johnson. One McKinsey presentation guided Johnson and Johnson on "Turbocharging Nuycynta," Janssen's tapentadol opioid.[67]




[65] Chris McGreal, *Johnson & Johnson faces multibillion opioids lawsuit that could upend big pharma*, THE GUARDIAN (June 23, 2019), available at https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial.

[66] Julia Lurie, *Inside Johnson and Johnson's Quiet Domination of the Opioid Market,* MOTHER JONES (June 11, 2019), available at https://www.motherjones.com/politics/2019/06/johnson-and-johnson-opioid-poppies-tasmania-oklahoma-lawsuit/.

[67] *See* Master Complaint at ¶ 381.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**4. McKinsey's work with the FDA.**

163. While advising Purdue and other manufacturers on how to confront FDA regulations, McKinsey was simultaneously advising the FDA itself.

164. Indeed, the FDA is a substantial client for McKinsey. Since 2008, the FDA has paid McKinsey more than $140 million.[68] A significant portion of that work related to the FDA's Center for Drug Evaluation and Research ("CDER"). The CDER is the principal division tasked with approving, among other classes of drugs, opioids. Since 2008, McKinsey has been awarded at least 17 contracts worth at least $48 million for CDER-related work.[69]

165. In 2010, McKinsey advised the FDA on building a monitoring system called "track and trace" to assist in the identification of potentially improper distribution of harmful prescription drugs, such as opioids. "The 'track and trace' system deeply impacted McKinsey clients."[70] Under one contract, McKinsey developed a roadmap and implemented plans to modernize CDER's new drug regulatory program. Under another, McKinsey developed a framework to increase information technology project delivery across CDER.[71] Under this contract, McKinsey was required to consult with "supply chain stakeholders," which likely included its manufacturing clients.[72]

166. In 2011, McKinsey also won a $1.8 million contract with CDER's Office of Surveillance and Epidemiology ("OSE"), which monitors and evaluates the safety profiles of drugs available to American consumers.[73] OSE "evaluates more than 2 million adverse event reports submitted every year to FDA's MedWatch program" and provides "risk management

---

[68] Letter to Dr. Janet Woodcock from Senator Margaret Hassan et al. (Aug. 23, 2021), available at https://www.hassan.senate.gov/imo/media/doc/fda-mckinsey_letter-final-210823.pdf ("Hassan Letter").

[69] *Id.*

[70] *See* CardinalHealth, *Board of Directors*, http://cg.cardinalhealth.com/board-of-directors/default.aspx (last accessed Oct. 28, 2022); Hassan Letter.

[71] Letter to Senator Chuck Grassley from Andrew Tantillo (Oct. 22, 2021), available at https://www.grassley.senate.gov/imo/media/doc/fda_to_grassley_-_mckinsey_conflicts_of_interest.pdf.

[72] *Id.*

[73] https://www.documentcloud.org/documents/21071060-mckinsey-ose-contract.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

expertise on development and implementation of programs and initiatives to support [CDER's] policies related to [REMS] authorities."[74]

167. The OSE contract tasked McKinsey with understanding how OSE functions within the context of a broader system of drug safety in CDER and ultimately developing and implementing a new operating model. In other words, McKinsey helped to restructure a key body that has oversight over the opioid supply chain.

168. The 2012 Food and Drug Administration Safety and Innovation Act required the FDA to modernize Sentinel, a system meant to monitor the safety of drugs once they are on the market. According to the FDA, "Sentinel generates *real-world evidence* to support regulatory actions aimed at protecting the public's health," which in turn "inform[s] healthcare provider decision-making for patients."[75]

169. A 2014 contract with the FDA charged McKinsey with assessing the "strengths, limitations and appropriate use" of Sentinel. Like the track and trace contract, the Sentinel project required McKinsey to interview "external stakeholders," including "industry organizations" and "drug and device industry leaders."[76] McKinsey also evaluated how the FDA employees used Sentinel to inform regulatory decision making.[77]McKinsey performed similar

---

[74] U.S. Food & Drug Admin., *CDER Office of Surveillance & Epidemiology* (Apr. 4, 2022), https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-office-surveillance-andepidemiology.

[75] https://www.fda.gov/files/about%20fda/published/Sentinel-System-Overview---Presentation.pdf; Steven Findlay, *The FDA's Sentinel Initiative*, HEALTH AFFAIRS (June 4, 2015), https://www.healthaffairs.org/do/10.1377/hpb20150604.936915/full/.

[76] Ian MacDougall, *McKinsey Never Told the FDA It Was Working for Opioid Makers While Also Working for the Agency*, PROPUBLICA (Oct. 4, 2021), available at https://www.propublica.org/article/mckinsey-never-told-thefda-it-was-working-for-opioid-makers-while-also-working-for-the-agency.

[77] Letter to Bob Sternfels from Representative Carolyn B. Maloney (Nov. 5, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-11-05.CBM%20to%20Sternfels-McKinsey%20re%20Document%20and%20Information%20Request%20%28001%29.pdf ("Maloney Letter").



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

work for the FDA as recently as 2019,[78] when it signed a contract extension with the agency for work relating to the FDA's efforts to modernize the process by which it regulates new drugs.[79]

170. The FDA's drug tracking programs have been panned as failures.[80]

171. A theme emerges: as new legislation and regulatory systems were enacted that could have hampered the opioid supply chain, McKinsey stepped in as a key consultant for the FDA. Each time, the new system failed to reign in the out-of-control opioid market. While the FDA was not solely responsible for regulating the opioid industry and McKinsey was not wholly responsible for the FDA's actions, tools like Sentinel and track and trace could have been implemented in a way to provide new information to combat the country's growing opioid crisis.

172. And at the same time it was consulting for the FDA, McKinsey was working with its opioid industry clients on how to skirt the FDA's regulatory systems.

173. For example, McKinsey advised Purdue on how to soften the FDA's proposed REMS and on coordinating with other opioid manufacturers to advocate against strict oversight.[81] The finalized REMS for opioid products was largely devoid of the restrictions that FDA had initially proposed.[82]

174. McKinsey's work with the FDA was a key factor in why pharmaceutical industry clients tapped McKinsey for FDA-related work. For example, in endorsing McKinsey's proposed strategy of banding together with other opioid manufacturers, Purdue CEO John Stewart suggested that the consultant itself facilitate the pharmaceutical group's approach to FDA. He wrote: "Perhaps a consultant such as McKinsey who did similar work in the industry

---

[78] MacDougall, *supra* note 77.

[79] Maloney Letter.

[80] Sabrina Tavernise, *F.D.A. Faulted for Problems With Drug Tracking*, THE NEW YORK TIMES (Jan. 14, 2016), available at https://www.nytimes.com/2016/01/15/health/fda-faulted-for-problems-with-drug-tracking.html; Gov. Accountability Office, *FDA Expedites Many Applications, But Data for Postapproval Oversight Need Improvement* (Dec. 2015), available at https://www.gao.gov/assets/gao-16-192.pdf.

[81] Hassan Letter.

[82] Hassan Letter; Maloney Letter.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

and FDA on some aspects of clinical trials or a healthcare-related group that would be interested in playing an active role in the program's development and delivery would be a good choice."[83]

175. McKinsey performed work for the FDA without disclosing its potential conflicts of interest to the FDA in violation of the contracts between the company and the agency.

176. The FDA typically includes conflict of interest clauses in its contracts and relies on contractors to assess and report any conflicts. McKinsey's contracts with the FDA related to CDER processes contained such provisions. One contract required McKinsey to "make an immediate and full disclosure, in writing, … of any potential or actual organizational conflict of interest or the existence of any facts that may cause a reasonably prudent person to question the contractor's impartiality because of the appearance or existence of bias."[84]

177. But McKinsey never disclosed its work on behalf of opioid supply clients to the FDA despite having a hand in developing some of the FDA's most important regulatory processes.[85]

178. Disclosing its conflicts might have turned off the lucrative tap to not only FDA contracts but also to pharmaceutical industry clients, given the clear value such clients placed on McKinsey's work for the FDA.

179. McKinsey's manipulation of regulatory requirements—whether to skirt its own contractual requirements or to bend processes that regulate its clients—is nothing new. McKinsey has come under fire from the Office of Inspector General for the General Services Administration for contract procurement violations[86] and from the Justice Department related to violation of Chapter 11 bankruptcy rules.[87] Most recently, six senators have begun to investigate

---

[83] Purdue Bankruptcy, Doc. 2166-5, at 58-59.

[84] MacDougall, *supra* note 77.

[85] *Id* Tantillo, *supra* note 72.

[86] Ian MacDougall, *How McKinsey Makes Its Own Rules*, PROPUBLICA (Dec. 14, 2019), available at https://www.propublica.org/article/how-mckinsey-makes-its-own-rules.

[87] Mary Williams Walsh and Emily Flitter, *McKinsey Faces Criminal Inquiry Over Bankruptcy Case Conduct*, NEW YORK TIMES (Nov. 8, 2019), available at https://www.nytimes.com/2019/11/08/business/mckinsey-criminal-investigation-bankruptcy.html.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

the relationship between McKinsey and the FDA[88] the House Committee on Oversight and Reform is exploring its conduct in connection with the opioid industry.[89]

180. As one commentator noted, McKinsey's conduct suggests that it "behaves as if it believes the rules should bend to its way of doing things, not the other way around."[90]

**5. McKinsey was aware of the devasting effects of opioids and continued to provide marketing advice.**

181. McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. In 2003, when McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson ("Pearson"), who stated that "[a]t McKinsey pharmaceuticals was one of our biggest industry groups."[91] In 2012, while advising Purdue, McKinsey described its health care capabilities as follows: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."[92]

182. By the time McKinsey was working with Purdue on sales and marketing in 2009, it already had extensive experience with opioids and knew the danger they posed. In 2013, McKinsey openly briefed Purdue on the ongoing concerns regarding OxyContin addiction and diversion among prescribers:[93]

---

[88] Hassan Letter.

[89] Maloney Letter.

[90] MacDougall, *supra* note 87.

[91] Michael Peltz, *Mike Pearson's New Prescription for the Pharmaceuticals Industry*, INSTITUTIONAL INV. (Sept. 3, 2014), https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry.

[92] *See* Master Complaint at ¶ 77.

[93] *Id.* ¶ 456.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594




183. In a PowerPoint slide titled "Findings on messaging and positioning," part of a "OxyContin growth opportunities: Phase 1 Final Report: Diagnostic" presentation, McKinsey noted that "most prescribers are concerned about abuse," and that "most physicians do not feel that [OxyContin] reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."[94]

184. In short, one reason that ***Purdue*** had knowledge that their own products were addictive and dangerous is because McKinsey told them.

185. McKinsey also knew its mandate: to increase Purdue's opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the ***overprescribing of opioids*** and the inevitable consequences thereof. McKinsey's job was to counter the intended results of the Corporate Integrity Agreement and figure out ways to sell as many pills as conceivably possible. Under McKinsey's guidance, Purdue's growth continued its upward trajectory unabated, the Corporate Integrity Agreement notwithstanding.

---

[94] *Id.* ¶ 457.


HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

186. Even if McKinsey had not been initially aware of the adverse consequences of OxyContin, the drug it was paid to sell, such ignorance could not survive its granular analytics. Moreover, in June 2009, the earliest known work McKinsey performed for Purdue consisted of "countering the emotional messages from mothers with teenagers that overdosed on OxyContin."

187. McKinsey's aggressive marketing strategies demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013, and ending December 31, 2015.[95] These dates are significant, as the study captures the timeframe that McKinsey's Project Turbocharge was implemented at Purdue.

188. The study noted "physician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."[96]

189. The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, ***the number of marketing interactions with physicians demonstrated a stronger association with mortality*** than the dollar value of marketing."[97] (Emphasis added.)

### 6. McKinsey continued consulting to increase the sale of opioids despite the nationwide epidemic.

190. Marvin Bower ("Bower"), a founding father of McKinsey and managing director of the firm from 1950 to 1967, instilled an ethos at McKinsey that has been reinforced

[95] Scott E. Hadland et al., *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related Overdoses*, 2 JAMA NETWORK 1 (Jan. 18, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914.

[96] *Id.*

[97] *Id.*



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

throughout the decades as a core value of the firm: "Deliver bad news if you must, but deliver it properly."[98]

191. McKinsey's work with Purdue, which began just after his death in 2003, would have been unrecognizable to Bower. Instead of acknowledging the elephant in the room – that Purdue's business was knowingly maximizing the amount of addictive and deadly opioids sold in the United States – and delivering that bad news properly to the client, McKinsey instead committed to partner with Purdue to maximize opioid sales.

192. On October 23, 2017, the president of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."[99]

193. Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its board of directors. Among them was perhaps McKinsey's most audacious suggestion: paying money – "rebates" – to health insurers whenever someone overdosed on Purdue's drug.

194. Once again, in perfect McKinsey parlance, these payments for future OxyContin overdoses were named "Event-Based contracts."[100] McKinsey provided estimates for the future costs of these "events."[101] McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal."[102]

---

[98] McDonald, *The Firm* 35.

[99] *See* Master Complaint at ¶ 486.

[100] *Id.* ¶ 488.

[101] McKinsey defined an "event" as "first occurrence for overdose or opioid use disorder." *Id.* ¶ 489.

[102] *Id.*



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

195. A "meaningful" amount, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs:[103]




196. The money would be paid to health insurers for the increased costs of additional medical services that resulted because Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances would not go to the individuals afflicted, nor the estates of the dead.

197. It is little surprise, then, that McKinsey was concerned with its legal liability for this work. Within months of recommending "event-based contracts" to Purdue, Elling raised this concern with Ghatak and suggested corrective action: destroying evidence.[104]

---

[103] *Id.*

[104] *Id.* ¶ 493.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Message

**From:** Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI]
**Sent:** 7/4/2018 12:10:13 PM
**To:** A G [drarnabghatak@gmail.com]
**Subject:** Re: [EXT]Re: Howdy

Have a great fourth. M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up. Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the Purdue Board. It probably makes sense to have a quick conversation with the risk committee to see if we should be doing anything other that eliminating all our documents and emails. Suspect not but as things get tougher there someone might turn to us. M
>>
>> +=====================================================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it. Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +=====================================================================+

198. Elling's prediction that things would "get tougher" for Purdue would prove prescient.

**7. A mea culpa.**

199. On December 5, 2020, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued is response media reports regarding McKinsey's work selling OxyContin after 2007:

# McKinsey statement on its past work with Purdue Pharma

*December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

200. But by the end of 2020—when McKinsey walked away from the opioids business—its strategies had already been implemented, and the damage done.

**D. McKinsey's Conduct Contributed to an Opioid Epidemic that has Wrought Havoc on Seattle Communities.**

201. The objective goal of McKinsey's consulting work for opioid manufactures was to encourage patients to seek, and doctors to prescribe, as many prescription opioids as conceivable. This worked. In 2011, when McKinsey was actively working with Purdue and other manufacturers, the opioid prescribing rate in King County was 66%, meaning that 66 opioid prescriptions were issued for every 100 residents.[105] Although local and state officials have since made a concerted effort to combat opioid abuse, as detailed below, the prescribing rate in King County remained above 35% in 2020.[106]

202. Misuse, abuse, and fatalities have inevitably resulted from the staggering number of pills McKinsey's clients pushed into Seattle. By 2009, opioids had become by far the leading cause of drug-related death in King County, with 8.59 deaths per 100,000 residents reported.[107] Moreover, prescription opioid abuse has not displaced heroin, but rather triggered a resurgence in its use. Individuals who are addicted to prescription opioids often transition to heroin because it is a less expensive, readily available alternative that provides a similar high.[108] Nationwide studies confirm that nearly 80% of all people who began to abuse opioids in the early 2000s, started with prescription drugs.[109] And the same pattern holds true in Seattle. Approximately

[105] CDC Report, U.S. County Dispensing Rates, 2011, available at https://www.cdc.gov/drugoverdose/rxrate-maps/county2011.html.

[106] CDC Report, U.S. County Dispensing Rates, 2020, available at: https://www.cdc.gov/drugoverdose/rxrate-maps/county2020.html.

[107] University of Washington, Alcohol and Drug Abuse Institute, *Drug-caused deaths in King County* (Feb. 21, 2017), available at: https://adai.washington.edu/WAdata/KingCountyDrugDeaths.htm.

[108] Theodore J. Cicero et al., *The Changing Face of Heroin Use in the United States: A Retrospective Analysis of the Past 50 Years*, 71 JAMA PSYCHIATRY 821-826 (July 2014), available at https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1874575; Heroin and Prescription Opiate Addiction Task Force, Final Report and Recommendations at 4 (Sept.15, 2016), available at https://kingcounty.gov/~/media/depts/community-human-services/behavioral-health-recovery/documents/herointf/Final-Heroin-Opiate-Addiction-Task-Force-Report.ashx?la=en.

[109] *Id.*



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

41% of heroin users interviewed at a Seattle syringe exchange in 2015 reported using pharmaceutical opioids—an increase of 30% in 2011—and another 53% stated that they were "hooked on prescription-type opiates prior to using heroin."[110]

203. As prescription opioid users turned to heroin, heroin-related overdose deaths also skyrocketed. By 2015, overdoses attributed to either prescription opioids or heroin accounted for approximately two-thirds of all drug-related deaths in King County.[111]

204. In King County, heroin and prescription opioids are involved in more overdose deaths than any other drug. In 2018, there were 277 overdose deaths in the county that involved at least one type of opioid.[112] Of those deaths, 100 were caused by prescription opioids and 156 involved heroin.

205. More recently, opioid abusers have turned to Fentanyl, an even more deadly synthetic opioid. In 2021, Fentanyl was involved in nearly 400 King County overdose deaths, more than any drug.[113]

---

[110] University of Washington, Alcohol and Drug Abuse Institute, *2015 Drug Use Trends in King County Washington* at 3 (July 2016), available at https://adai.uw.edu/pubs/pdf/2015drugusetrends.pdf.

[111] *Id.*

[112] Pub. Health Dep't, Seattle & King County, *2018 Overdose Death Report* (June 2019), available at: https://www.kingcounty.gov/depts/health/~/media/depts/health/medical-examiner/documents/2018-overdose-death-report.ashx.

[113] King County Fatal Overdose Dashboard, available at: https://kingcounty.gov/depts/health/examiner/services/reports-data/overdose.aspx (last accessed Oct. 28, 2022).



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594




206. And, while overdose rates are clearly a countywide issue, the problem is particularly acute in Seattle. Between 2016 and 2017, 53% of all overdose deaths within King County occurred in Seattle.[114]

(U) Figure 2. 2016 Opioid overdose deaths in King County.




Source: King County Medical Examiner data

207. Opioid abuse is also a leading cause of non-lethal drug poisonings and associated medical treatments, which are frequently provided at public expense. In just the first six months

[114] Pub. Health Dep't, Seattle & King County, *2017 Overdose Death Report*, available at: https://www.kingcounty.gov/depts/health/news/2018/May/~/media/depts/health/medical-examiner/documents/2017-overdose-death-report.ashx.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

of 2019, there were 1,291 opioid-related emergency department encounters in King County—most of which took place at Seattle hospitals.[115] In the same time period, there were 1,228 probable opioid overdoses treated by King County EMS agencies.[116]

208. Publicly-funded drug treatment admissions in King County for the abuse of prescription opioids has increased—492% between 1999 and 2010.[117] In 2015, the King County Mental Health, Chemical Abuse and Dependency Services Division reported that opioids were the primary substance used by 62% of persons admitted for detoxification treatment.[118] And, for each year between 2006 and 2015—the peak of McKinsey's consulting work with opioid manufacturers—King County poison centers reported more calls for pharmaceutical opioids than any other drug.[119]

---

[115] King County Public Health Non-fatal Overdose Statistics, available at https://www.kingcounty.gov/depts/health/overdose-prevention/non-fatal.aspx (last accessed Oct. 28, 2022).

[116] *Id.*

[117] University of Washington, *supra* note 113, at figure 3a.

[118] King County Mental Health, Chemical Abuse and Dependency Services Division, *Substance Abuse Prevention and Treatment Annual Report* at 20 (2015), available at https://www.seattle.gov/documents/departments/cityAttorney/opioidLitigation/FN65-KCMH-CADSD-Substance%20Abuse%20Annual%20Report-2015.pdf.

[119] University of Washington, *supra* note 113, at Figure 6.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

| Drug | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Pharmaceutical Opioids* | *3,532* | *3,572* | *3,824* | *3,735* | *808* | *943* | *779* | *567* | *571* | *528* |
| Benzodiazepines | 2,071 | 2,200 | 2,521 | 2,403 | 541 | 536 | 495 | 437 | 395 | 385 |
| Dextromethorphan | 2,198 | 2,113 | 1,764 | 1,545 | 395 | 369 | 286 | 298 | 293 | 284 |
| Oxycodone | 1,032 | 1,113 | 1,208 | 1,278 | 294 | 351 | 261 | 179 | 168 | 164 |
| Hydrocodone | 1,192 | 1,146 | 1,212 | 1,113 | 222 | 235 | 210 | 172 | 149 | 140 |
| Cannabinoids/Marijuana/THC | 119 | 150 | 152 | 155 | 57 | 111 | 83 | 80 | 115 | 112 |
| Amphetamine e.g. Adderall | 526 | 473 | 486 | 410 | 106 | 108 | 123 | 113 | 104 | 95 |
| Methylphenidate e.g. Ritalin, Concerta | 286 | 324 | 342 | 316 | 81 | 72 | 66 | 62 | 52 | 70 |
| Heroin | 39 | 40 | 63 | 58 | 21 | 34 | 40 | 49 | 75 | 60 |
| Tramadol | 234 | 302 | 392 | 331 | 74 | 85 | 68 | 57 | 56 | 52 |
| Methamphetamine | 64 | 48 | 103 | 110 | 24 | 55 | 60 | 60 | 46 | 52 |
| Codeine | 429 | 348 | 379 | 382 | 80 | 69 | 59 | 48 | 57 | 51 |
| Buprenorphine | 0 | 0 | 0 | 0 | 5 | 48 | 50 | 30 | 30 | 33 |
| Methadone | 398 | 430 | 396 | 407 | 88 | 77 | 62 | 40 | 46 | 33 |
| Morphine | 226 | 209 | 217 | 211 | 43 | 43 | 35 | 22 | 29 | 29 |
| Cocaine | 154 | 133 | 132 | 102 | 39 | 93 | 50 | 23 | 30 | 27 |
| Carisoprodol e.g. Soma | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 25 |
| Hallucinogenic amphetamine e.g. MDMA | 114 | 81 | 87 | 65 | 21 | 25 | 24 | 37 | 28 | 15 |
| Hydromorphone | 0 | 0 | 0 | 0 | 0 | 18 | 21 | 10 | 24 | 14 |
| Cyclobenzaprine e.g. Flexeril | 123 | 157 | 156 | 168 | 37 | 15 | 15 | 11 | 10 | 12 |
| LSD | 11 | 11 | 7 | 10 | 1 | 1 | 6 | 10 | 6 | 10 |
| GHB and analog/precursor | 19 | 10 | 18 | 16 | 9 | 1 | 6 | 7 | 7 | 9 |
| Fentanyl | 0 | 0 | 0 | 0 | 1 | 14 | 10 | 8 | 10 | 7 |
| Ketamine and analogs | 8 | 1 | 5 | 5 | 5 | 5 | 1 | 5 | 5 | 5 |
| Meperidine | 21 | 24 | 20 | 13 | 1 | 0 | 2 | 1 | 0 | 3 |
| Oxymorphone | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 2 |

209. The opioid epidemic has also had a significant detrimental impact on teenagers and young adults. A 2018 Healthy Youth Survey indicated that approximately 2,500 Washington State 12th graders had tried heroin at least once and even more—about 3,500—used pain killers to get high in any given month.[120]

210. Even infants have not been immune to the impact of opioid abuse. In Washington, the number of newborns diagnosed with Neonatal Abstinence Syndrome ("NAS") has increased drastically during the opioid epidemic. NAS is a post-natal drug withdrawal syndrome that occurs among opioid-exposed infants shortly after birth, often manifested by central nervous system instability, autonomic over-reactivity, and gastrointestinal tract dysfunction. NAS is associated with increased incidence of seizures, respiratory problems, feeding difficulties and low birth weight, along with common symptoms of drug withdrawal, including diarrhea, excessive crying, fever, hyperactive reflexes, and sleeping difficulties. The State's Office of Financial Management has studied cases in which a pregnant mother received a drug-use

[120] Wash. State Dep't of Health, 2018 Washington State Healthy Youth Survey, available at: https://www.doh.wa.gov/Portals/1/Documents/8350/160-NonDOH-DB-Opiates.pdf (last accessed Oct. 28, 2022).



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

diagnoses during her maternal stay and concluded that opioids (including heroin) "had, by far, the highest rates and greatest number of cases—and they are markedly trending upwards."[121]

211. Homelessness in Seattle is a complicated issue, and opioid abuse is one of its causes. The 2019 Count Us In annual Point In Time (PIT) count for Seattle and King County, found a total of 11,199 people experiencing homelessness countywide. And death reports indicate that opioid abuse is increasingly responsible for fatalities within this growing population.[122] In 2018, 16% of the opioid overdoses in King County were among people experiencing homelessness.[123] The high rate of opioid use among the homeless population is further compounded by the obstacles that homeless people must overcome to obtain treatment. Data obtained by the Seattle Public Health King County Needle Exchange Program shows that only 48% of the homeless population successfully accesses methadone treatment, compared to a 75% success rate among users who are stably housed.[124]

212. Law enforcement statistics reflect a rise in opioid abuse. The percent of King County drug seizures testing positive for heroin has increased nearly six-fold—from 7% in 2008 to 40% in 2015.[125] In 2015, more than 45% of drug seizures by King County law enforcement involved either prescription opioids or heroin.[126]

213. As this data reflects, prescription opioid misuse, abuse, and overdose has catastrophic impacts. Beyond the tragic repercussions for addicted individuals—including overdoses, job loss, loss of custody of children, physical and mental health problems, homelessness and incarceration—opioid abuse causes instability in communities and

---

[121] Washington State Office of Financial Management, Maternal and Newborn Inpatient Stays with a Substance Use or Use-Related Diagnosis, February 2016, at 3.

[122] Heroin and Prescription Opiate Addiction Task Force, *supra* note 111, at 6.

[123] 2018 Overdose Death Report, *supra* note 115.

[124] King County Heroin and Opioid Task Force, *Heroin and Opioid Trends*, available at: http://www.kingcounty.gov/depts/community-human-services/mental-health-substance-abuse/task-forces/heroin-opiates-task-force.aspx.

[125] *Id.*

[126] University of Washington, Alcohol and Drug Abuse Institute, *Drug trends across King County: Crime lab data*, available at: https://adai.washington.edu/WAdata/King_County_cases.htm (last accessed Oct. 28, 2022).



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

unsustainable demand on community services such as hospitals, courts, child services, treatment centers, and law enforcement. These are costs that Seattle must bear.

**E. McKinsey Has Caused the City Substantial Economic Injury**

214. Seattle has expended millions of dollars trying to combat the opioid epidemic that is ravaging its communities. The City has suffered economic injuries that are direct, ascertainable, quantifiable, and that would not have been incurred but for McKinsey's conduct.

**1. Public health services.**

215. The Seattle Human Services Department invests millions annually in public health initiatives, a significant portion of which are devoted to treating opioid addiction.

216. The City spends, for instance, substantial funds each year on methadone and buprenorphine[127] treatments for opioid addicts. This treatment is labor intensive, with patients being seen six days per week initially. Random urine testing and regular counseling sessions are also mandatory for all patients being treated with methadone or buprenorphine and further add to the cost. The Seattle & King County Public Health Department opened the Buprenorphine Pathways Program in January 2017. The program, which provides same-day medication starts onsite, was at capacity within 13 weeks with people lining up two hours before opening to receive care.

217. Because of the surge in heroin use, the City has been forced to confront the very serious public health hazards posed by hypodermic needles. King County spends substantial sums per year on its needle exchange program.[128] In 2016, Seattle Public Utilities started a pilot program to collect needles as one of several test initiatives aimed at improving the safety and cleanliness of the City's neighborhoods. In the first 15 months of operation, the program

[127] Buprenorphine, also known by its brand name, Suboxone, is an alternative to methadone with a different delivery system. It can be taken in a pill or on a film, and is thus easier for patients traveling.

[128] Pub. Health Seattle & King County, *King County Needle Exchange* (Oct. 12, 2022), available at: https://www.kingcounty.gov/depts/health/communicable-diseases/hiv-std/patients/drug-use-harm-reduction/needle-exchange.aspx.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

collected and safely disposed of 32,012 hypodermic syringes.[129] On March 30, 2018, the Seattle Public Library system announced its plan to install sharps containers in all restrooms at its downtown, Ballard, University District, and Capitol Hill branches after a custodian was pricked with a hypodermic needle at the Ballard library.[130] Local businesses have similarly had to install sharps boxes in their facilities after employees have reported finding blood and needles in bathrooms, as well as being pricked by improperly discarded needles.[131]

218. Seattle also makes substantial annual contributions to the King County Needle Exchange which operates programs in Belltown, Capitol Hill, and the University District. At each needle exchange location, opioid addicts can exchange used syringes for sterilized ones while receiving basic health services, including infectious disease testing, Hepatitis A and B vaccinations, and treatment readiness counseling.

219. In 2019, with opioid overdose deaths soaring, Seattle launched a program to distribute Naloxone to nightclub staff and train them in its use.[132] Most recently, Seattle Public Library authorized its employees to carry and administer Naloxone, while initiating related training for Library staff.[133]

---

[129] jseattle, *'Sharps' program collecting 2,000+ old needles a month across Seattle*, CAPITOL HILL SEATTLE BLOG (Oct. 24, 2017), available at https://www.capitolhillseattle.com/2017/10/sharps-program-collecting-2000-old-needles-a-month-across-seattle/.

[130] Erica C. Barnett, *Seattle Public Library Will Now Install Sharps Containers at Some Branches*, SEATTLE MAGAZINE (updated Mar. 30, 2018), available at http://www.seattlemag.com/news-and-features/seattle-public-library-will-now-install-sharps-containers-some-branches.

[131] Kate Taylor, *Drugs and syringes have become such a problem in Starbucks bathrooms that the company is installing needle-disposal boxes in certain locations*, BUSINESS INSIDER (Jan. 9, 2019), available at https://www.businessinsider.com/starbucks-workers-petition-bathroom-needle-disposal-boxes-2019-1.

[132] Ryan Blethen, *Seattle enlisting bartenders and bouncers in the fight against opioid overdoses*, SEATTLE TIMES (Apr. 9, 2019), https://www.seattletimes.com/seattle-news/health/seattle-bars-and-nightclubs-are-training-employees-to-save-people-from-overdoses/.

[133] Daisy Zavala Magaña, *Seattle Public Library staff authorized to administer naloxone*, SEATTLE TIMES (Sept. 29, 2022), https://www.seattletimes.com/seattle-news/seattle-public-library-staff-authorized-to-administer-naloxone/.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**2. Paramedic services.**

220. Seattle has also expended substantial financial resources to support first responders who provide services and medical interventions for opioid addicts. Every year, the Seattle Fire Department responds to thousands of 911 calls which arise from prescription opioid or heroin abuse and require the use of naloxone (aka Narcan), a drug that can reverse an opioid overdose. Naloxone is costly and has a short shelf life, meaning that supplies of the drug must be regularly replenished. In total, each one of these medical response calls cost the City an average of $2,000. In 2017, over the span of just three months, the Seattle Fire Department administered naloxone 140 times—more than once per day—costing the City approximately $280,000 for these calls alone. These expenses are in addition to the cost of purchasing the injectors needed to administer naloxone and the cost of training personnel on their proper use.

221. The Seattle Fire Department responds to an even greater number of opioid-related medical emergencies in which naloxone is not administered, including overdoses that are not life threatening. In the three months preceding September 25, 2017, records maintained for at least 453 separate Seattle Fire Department calls contain opioid-related terms, such as "methadone" or "heroin." At $2,000 per response, that equates to a cost of $906,000 to the City.

**3. Policing services and criminal justice costs.**

222. Seattle police also carry naloxone and respond to instances of opioid overdose throughout the City. Between July and August of 2016, Seattle police officers responded to 49 drug-involved incidents in which opioids were certainly or likely involved. Police officers responded to an additional 234 drug-related incidents in which opioids could not be ruled out. In addition to the cost of equipping the police department with naloxone, officers also must receive training in its proper application.

223. Due to rising rates of opioid-related crime in Seattle, the City's police officers also must spend a significant amount of time addressing and prosecuting opioid-related offenses. This detracts greatly from their ability to devote time to the many other services they are counted on to provide.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

224. Moreover, to address the opioid-related crises occurring every day across the City, police officers require special training, which Seattle has spent millions providing. In 2017, for example, Seattle police officers spent 31,200 hours in Crisis Intervention Training ("CIT"), at costs approaching $2 million. Nearly half of Seattle's police department has been certified in CIT, at additional costs exceeding $1 million. The Seattle Police Department spent another $188,000 for other drug-related training in the same year.

225. When Seattle police officers take opioid-addicted criminal offenders to the King County Jail, or to other local jails, the City is "billed back" for the fees and costs associated with the incarceration. Seattle jail facilities have been inundated with opioid addicts who, upon detention, undergo dangerous drug withdrawal. Treating these individuals is both labor and cost intensive, with many Seattle-area nurses spending substantial amounts of time in jail quarantine units providing the necessary care. Moreover, addicts experiencing serious withdrawal are often not healthy enough to be placed in general population modules, and must be transported to a medical unit that bills Seattle at significantly higher costs per day.

226. In collaboration with King County, Seattle has pioneered the Law Enforcement Assisted Diversion ("LEAD") program, which diverts low-level drug abusers out of the criminal-justice system and into community-based care programs where they can receive nourishment, access to treatment services, and job training. Although costly to operate, LEAD has substantially reduced recidivism in Seattle. According to a 2015 University of Washington study, participants in the LEAD program are 58% less likely to be arrested than people in a control group.[134] LEAD has now been replicated by dozens of cities and counties across the country.[135] Seattle has contributed millions of dollars to fund the continued operation and expansion of LEAD.

---

[134] *See* Press Release, *Innovative Law Enforcement Assisted Diversion (LEAD) Program is Showing Success* (Apr. 8, 2015), available at https://depts.washington.edu/harrtlab/wordpress/wp-content/uploads/2015/04/2015-04-08-LEAD-Press-Release-and-Evaluation-Summary.pdf.

[135] *See* https://www.leadbureau.org/; *see also* Nicholas Kristof, *Seattle Has Figured Out How to End the War on Drugs*, N.Y. TIMES (Aug. 23, 2019), available at: https://www.nytimes.com/2019/08/23/opinion/sunday/opioid-crisis-drug-seattle.html.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**4. Combatting homelessness.**

227. The opioid crisis has contributed to the City of Seattle's crisis involving homelessness. City agencies have been forced to devote ever-increasing resources toward combatting homelessness and its effects.

228. Seattle spends millions of dollars each year to provide health care for the homeless through community health clinics and mobile medical programs. In addition, a number of municipal departments—including the Department of Parks and Recreation, Public Utilities Department, Department of Transportation, and Finance and Administrative Services Department—have spent millions of dollars on outreach, medical, and counseling services for unhoused persons living in encampments across the City.

229. The City also makes significant investments to clear encampments and clean the sites. Before the encampments can be cleared, the City makes every effort to provide counseling services to the people who have been living there and to assist them in locating alternative housing. Extensive and repeated notice is also provided. Personal belongings are carefully cataloged and stored for future pickup or delivery to owners (with the associated fees being paid by Seattle). Moreover, the encampments generate an enormous amount of trash which must be hauled away at the City's expense. Cleaning the sites almost always involves disposing of needles that have been used to inject opioids. In 2017, Seattle's Department of Parks and Recreation spent over $800,000 to clear 3,000 tons of waste from 140 homeless encampments, nearly all of which contained hypodermic needles. Since Seattle's homeless clean-up programs began, the City has removed millions of pounds of garbage and collected more than 111,000 syringes.

230. All of these efforts have necessitated additional staffing across multiple departments. In 2017, the Seattle Police Department, for example, had 15 full-time officers working exclusively on homelessness, and the Mayor's Office had three full-time employees devoted to the issue. In February 2017, the City launched a Navigation Team—a group of specially-trained police officers and outreach workers—to engage unsheltered people living in tents in unsanctioned areas of Seattle and to sweep homeless encampments. In April 2019, the



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

City hired three more people to the Navigation Team as part of a $244,000 expansion initiative, bringing the total number of personnel to 38. In total, Seattle spent $86.7 million combatting homelessness in 2018 and has a proposed budget of $89.5 million in 2019.[136]

231. The foregoing costs exemplify, but do not exhaustively demonstrate, the immense burden that McKinsey's conduct has imposed on Seattle. For the City to recover from this crisis, additional resources are critically needed to support community health programs, sponsor preventative education, fund naloxone distribution, monitor opioid prescribing, safely dispose of unused pills, police opioid-related crime, and process and rehabilitate opioid offenders through the criminal justice system.

## V. TOLLING OF STATUTES OF LIMITATIONS

232. McKinsey is equitably estopped from relying upon a statute of limitations defense because, alongside its clients, McKinsey undertook active efforts to purposefully conceal its unlawful conduct and fraudulently assure the public and Seattle that opioids were non-addictive, effective, and safe for the treatment of long-term chronic pain and non-acute, non-cancer pain. McKinsey consulting services were given confidentially, and both McKinsey and its clients concealed the content of those services from the public.

233. McKinsey also concealed from Seattle the existence of Seattle's claims by hiding it and its clients' lack of cooperation with law enforcement. McKinsey's clients publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens. These repeated misrepresentations—which McKinsey acquiesced in and never corrected—misled regulators, prescribers, and the public, including Seattle, and deprived Seattle of actual or implied knowledge of facts sufficient to put Seattle on notice of potential claims.

[136] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

234. Seattle did not discover the nature, scope and magnitude of McKinsey's misconduct, and its full impact on Seattle, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

235. Prior to the applicable limitations period, Seattle did not suspect, and had no reason to suspect, that McKinsey's conduct caused its injuries, including the consumption of Seattle's resources as the opioid epidemic remains unabated.

236. McKinsey intended that its actions and omissions would be relied upon, including by Seattle. And Seattle reasonably relied on those actions and omissions.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION:

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO), 18 U.S.C. § 1961, *ET. SEQ.*

237. Seattle incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

238. This claim is brought by Seattle against McKinsey for actual damages, treble damages, and available injunctive and/or equitable relief under 18. U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq.*, specifically, 18 U.S.C. § 1962(c) and (d).

239. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d). McKinsey conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and § 1962(d).

**<u>Description of the Enterprise</u>**

240. Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

241. Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

242. Opioid manufacturers, including Purdue, Endo, and Johnson & Johnson (the "Opioid Manufacturers"), together with McKinsey (collectively, the "Opioid Marketing Enterprise Members" or the "Enterprise Members") engaged in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription painkiller market and the market as a whole—through repeated and systematic misrepresentations, concealments, and omissions of material fact about the safety and efficacy of opioids for treating long-term chronic pain, together with other deceptive and fraudulent acts and practices, as described in this Complaint.

243. To unlawfully increase the demand for opioids and thereby increase their own profits despite their knowledge of the harmful effects that would follow, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise" or the "Enterprise"). The Opioids Manufacturers worked together to accomplish their aims, with McKinsey serving as a go-between that held all of the companies together and helped coordinate the deceptive marketing and sales strategies. Through McKinsey and their own personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose: lying to prescribers and Seattle to increase sales of addictive and dangerous drugs and line the enterprise members' pockets. The Opioid Marketing Enterprise Members' substantial financial contributions to the Opioid Marketing Enterprise and the advancement of opioids-friendly messaging fueled the U.S. opioid epidemic.

244. In the alternative, the association-in-fact Opioid Marketing Enterprise existed just between McKinsey and Purdue, who worked together to unlawfully increase sales of opioids—and grow Purdue's share of the prescription painkiller market—through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain. McKinsey knew Purdue was marketing its opioids illegally and fueling an opioid epidemic, but



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

using the knowledge it gained from its work with other opioid manufacturers, McKinsey joined forces with Purdue to turbocharge the opioids market in order to profit from this crisis.

245. The Controlled Substances Act (the "CSA") and its implementing regulations require that "[e]very person who manufactures, distributes, dispenses, imports, or exports any controlled substance," including opioids, become a "registrant." *See* 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.11(a). These registrants, including opioid manufacturer and distributors, must maintain a system to identify and report suspicious orders, including orders of unusual size or frequency, or orders deviating from a normal pattern, and maintain effective controls against diversion of controlled substances. *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

246. Despite these duties, McKinsey and the other Enterprise Members engaged in a scheme with the overarching purpose of materially expanding prescription opioid use by altering the medical community's opioid prescribing practices through repeated fraudulent statements and misrepresentations. The Opioid Marketing Enterprise's scheme was sophisticated, well developed, and fraudulent and was designed to increase the prescription rate for opioid medications the Enterprise Members knew where dangerous and highly addictive. At all relevant times, McKinsey was aware of the conduct of the Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form of payments from other Enterprise Members as a reward for work done to increase sales and distribution of prescription opioids.

**<u>The Common Purpose and Scheme of the Opioid Marketing Enterprise</u>**

247. The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and Seattle and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. These misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition, which the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing


HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

248. The scheme devised, implemented, and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Manufacturers' drugs. The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme.

249. There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

250. As public scrutiny and media coverage focused on how opioids ravaged communities throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, despite its knowledge of the ongoing fraud and the danger it posed, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

251. The impact of the Opioid Marketing Enterprise's scheme is still in place—i.e., opioids continue to be over-prescribed and used for chronic pain throughout the United States, and the epidemic continues to injure Seattle and consume the resources of Seattle.

252. The evidence shows that the Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**The Conduct of the Opioid Marketing Enterprise Violated Civil RICO**

253. From at least 2004 to the present, each of the Opioid Marketing Enterprise Members played some part in directing the affairs of the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

254. Creating and providing a body of deceptive, misleading, and unsupported medical and popular literature about opioids that:

a. understated the risks and overstated the benefits of long-term use;

b. appeared to be the result of independent, objective research; and

c. was thus more likely to be relied upon by physicians, patients, and payors;

257. Creating and providing a body of deceptive, misleading, and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

255. Creating and providing a body of deceptive, misleading, and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

256. Devising and implementing marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints; and

257. Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications.

258. The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to enrich themselves by increasing sales of prescription opioids by convincing doctors to prescribe and patients to use opioids,



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

including for long-term chronic pain, despite the Opioid Marketing Enterprise Members' knowledge of the addictions and deaths that would occur as a result. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

**<u>The Opioid Marketing Enterprise Members Conducted or Participated, Directly or Indirectly, in the Conduct of the Enterprise's Affairs</u>.**

259. "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

260. As described herein, the Opioid Marketing Enterprise Members participated in the conduct of the Enterprise through a pattern of racketeering activity, and McKinsey was the mastermind of marketing schemes deployed by the Enterprise Members to defraud prescribers and Seattle by using the mail and wires in furtherance of plans that were designed with specific intent to defraud.

261. The Opioid Marketing Enterprise Members conducted an association-in-fact enterprise and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain. Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the Enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use. In so doing, each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Enterprise by engaging in mail and wire fraud, in violation of 18 U.S.C. §§ 1962(c) and (d).

262. The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

263. Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the Enterprise's common purpose of increasing profits and sales through the knowing and intentional



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

264. Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the Enterprise's goals and conceal their role, and the Enterprise's existence, from prescribers and Seattle by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding key opinion leaders ("KOLs") to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

265. Further, each of the Opioid Marketing Enterprise Members had systematic links to, and personal relationships with, each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities The systematic links and personal relationships that were formed and developed allowed the Opioid Marketing Enterprise Members the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Opioid Marketing Enterprise Members coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individual and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

266. At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each Opioid Manufacturer and McKinsey; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Enterprise; and (e) had sufficient longevity for the Enterprise to pursue its purpose an functioned as a continuing unit.

267. The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids and expand the market for opioids.

268. The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S Mail, and interstate wire facilities. The Opioid Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones, and the internet to transmit communications and payments in interstate or foreign commerce.

**<u>The Conduct was More than a Typical Business Relationship</u>**

269. There were strong relationships among those associated with the Opioid Enterprise and sufficient longevity among Enterprise associates to pursue the Enterprise's common purpose. The common purpose was to increase opioid revenues unlawfully by misrepresenting and lying about opioids in order to change prescriber habits and prevailing views regarding the safety and efficacy of opioids for chronic pain and long-term use. The Enterprise's deceit was, in part, in its failure to disclose that increasing strength and dosing actually increased the risk of addiction and overdose and that patients on opioids for more than a brief period develop tolerance, requiring increasingly high doses to achieve pain relief.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

270. On March 1, 2004, McKinsey entered into a "Master Consulting Agreement" with Purdue for "services that would be defined from time to time."[137] The Master Consulting Agreement was signed by then-McKinsey director Rob Rosiello."[138]

271. From 2004 through 2008, McKinsey advised Purdue on research and development, business development, and product licensing related to Purdue's opioid products.[139] Consistent with its business model, McKinsey leveraged these projects into growth of its "Broader Strategy work" also underway with Purdue.[140] Specifically, in October 2008, Purdue retained McKinsey for broad strategy work after two board members "blessed" Purdue executive Craig Landau with doing "whatever he thinks is necessary to 'save the business'" after the 2007 criminal plea and introduction of generic competition to the older OxyContin.[141] Purdue relied heavily on McKinsey to help Purdue publicly portray itself as a good corporate citizen who could now be trusted and was even working on an "abuse-deterrent" or "ADF" form of OxyContin.

272. Over their many years of working together, McKinsey and Richard Sackler developed a close relationship. Indeed, one McKinsey partner, Maria Gordian, describes herself as a counselor to Richard Sackler in an "Ey 2009 Impact Summary."[142] The Opioid Marketing Enterprise was more than a typical business relationship. Rather, the members of the Enterprise knew that opioids were addictive and causing serious harm to people and communities but chose to work together to lie to prescribers and Seattle about these drugs in order to increase their bottom lines. McKinsey worked closely with the Opioid Manufacturers to achieve these aims. McKinsey, as an advisor of multiple Opioid Manufacturers, also had access to information about multiple players and was able to coordinate the fraud occurring across the Enterprise. As

[137] *See* Master Complaint at ¶ 581.

[138] *Id.*

[139] *Id.* ¶ 582.

[140] *Id.*

[141] *Id.*

[142] *Id.* ¶ 583.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

discussed below, McKinsey was particularly embedded in Purdue's organizational structure and the relationship's longevity was sufficient to pursue the Enterprise's purposes. During the 2009-2014 period in particular, Purdue relied extensively on McKinsey to develop its sales and marketing strategy for OxyContin.

273. The intent to defraud is evident in the McKinsey's attempts to strengthen its relationship with Purdue and assist Purdue in selling opioids after Purdue's 2007 criminal guilty plea. As part of the guilty plea, Purdue admitted that its "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medication."[143] But undeterred by this, McKinsey dove in. In a March 2009 self-assessment, Ms. Gordian described McKinsey's progress in having "continue[d] to expand the depth and breadth of [its] relationships with Purdue" and plans to "deepen[]" McKinsey's "relationship with the Sackler family," including by "serving them on key business development issues" and "expanding" McKinsey's relationship with members of Purdue's senior management team.[144]

274. By August 2009, Richard Sackler had convened a meeting of Purdue board members and staff to discuss efforts to "reverse the decline in the OxyContin tablets market."[145] During the 2009-2014 period in particular, Purdue relied extensively on McKinsey to develop its sales and marketing strategy for OxyContin. McKinsey worked closely with Purdue on both the creation and implementation of OxyContin sales strategy. McKinsey's work for Purdue included consulting, review of product acquisition, evaluation of research and development, advising Purdue on the design of clinical studies, risk management, and product marketing.[146]

275. On May 28, 2013, McKinsey entered into a "Statement of Services to the Master Consulting Agreement" (the "2013 Agreement") with Purdue to "conduct a rapid assessment of the underlying drivers of current OxyContin performance, identify key opportunities to increase

---

[143] *Id.* ¶ 585.

[144] *Id.*

[145] *Id.* ¶ 586.

[146] *Id.*



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

near-term OxyContin revenue and develop plans to capture priority opportunities."[147] The 2013 Agreement stated, "We have a long history of partnership with Purdue, and we would make best efforts to leverage our understanding of your business—both in terms of content and culture." The 2013 Agreement was signed by then-principal Arnab Ghatak who would "lead the team with senior leadership from Rob Rosiello and Martin Elling."[148]

276. Thereby, even after the 2007 guilty plea, Purdue, with McKinsey's aid, saw growing profits from opioid sales. In 2015 alone, Purdue obtained $3 billion in annual opioid sales—a four-fold increase from its 2006 sales of $800 million.

277. McKinsey's relationship with Purdue went far beyond a typical business relationship. McKinsey worked closely with Purdue on both the creation and implementation of OxyContin sales strategy, a strategy McKinsey knew had been based on misleading and defrauding doctors and patients alike about a dangerous and highly addictive drug.

278. Further, McKinsey had access to detailed prescribing information enabling it to determine if there were suspicious or problematic prescribing patterns. Rather than using this information to help its clients prevent diversion of controlled substances, McKinsey and the Opioid Marketing Enterprise used this information in furtherance of their scheme to defraud prescribers and Seattle, target and increase sales to prescribers who were overprescribing, and continue to fuel opioid addiction and the resulting epidemic.

**<u>The Fraudulent Schemes</u>**

279. As detailed above, the operation of the Opioid Marketing Enterprise, included several schemes to defraud that helped to further the goals of its members—i.e., to expand the market and increase profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and to increase profits for the Enterprise Members via expanding the market for opioids.

**Fraudulent Marketing Scheme: Deceptive Messaging Regarding Opioid Use**

[147] *Id.* ¶ 587.

[148] *Id.* ¶ 588.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

280. As described throughout, McKinsey sought to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain by changing prescriber habits and public perception regarding the safety and efficacy of opioids. McKinsey's fraud specifically targeted prescribers and set out to convince them that they should prescribe more and more opioids, overcoming what could otherwise be a check on opioid manufacturers ability to increase sales of addictive products.

281. Despite McKinsey knowing that reformulated OxyContin could still be abused, having advised Purdue on the design of tests of reformulated OxyContin as part of Purdue's FDA submission,[149] in furtherance of the scheme to defraud, McKinsey spread messages that prescribing opioids could provide "freedom" and "peace of mind" for its users and that physicians could "tailor the dose."

282. After Purdue's 2007 criminal plea for illegally marketing OxyContin, McKinsey created strategies to repair Purdue's reputation and boost OxyContin sales. In 2008, Purdue submitted a New Drug Application for a reformulation of OxyContin, ostensibly to make it more difficult to abuse by extracting the active ingredient from it or otherwise defeating the time release mechanism in OxyContin tablets.

283. In June 2009, McKinsey helped Purdue prepare for an FDA advisory committee meeting.

284. McKinsey prepared for Purdue an "FDA Advisory Committee on Reformulated OxyContin: Question & Answer Book" in September 2009, with questions including "Why should we trust you?" In response, McKinsey recommended Purdue say "We acknowledge mistakes made in the past[;]" "We have x, y and z measures in place that did not exist before[;]" and "[a]t all levels, Purdue's focus is on maintaining the highest ethical standards and meeting the needs of patients[.]"[150] To the question of "Who at Purdue takes personal responsibility for all these deaths?[,]" McKinsey recommended Purdue say, "We all feel responsible[.]"

---

[149] *Id.* ¶ 594.

[150] *Id.* ¶ 597.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

285. McKinsey and the other Opioid Marketing Enterprise Members knew the changes Purdue made would not make opioids non-addictive or prevent them from being used to create and further substance abuse problems. For example, in 2009, the FDA noted in permitting ADF labeling that "the tamper-resistant properties will have no effect on abuse by the oral route (the most common mode of abuse)." Similarly, in approving reformulated OxyContin, the FDA cautioned that the reformulation "is not completely tamper resistant and those intent on abusing this new formulation will likely find a means to do so. In addition, the product can still be misused or abused and result in overdose by simply administering or ingesting larger than recommended oral doses."[151]

286. Despite this knowledge, the Opioid Marketing Enterprise pursued messaging and a strategy that was deceptive and was designed to deceive doctors in particular. Even after Purdue pleaded guilty to offenses related to its marketing and distribution of addictive opioids, McKinsey advised Purdue to market OxyContin to encourage more prescriptions (that it knew would lead to abuse and overdose events) at higher dosages by loyalist prescribers.

287. McKinsey intentionally set out to target doctors as a cog in the Enterprise's scheme to defraud. Indeed, deceiving doctors was part of the marketing scheme, and doctors were utilized in furtherance of the marketing scheme. Medical providers were not a break in the causal chain of harm to Seattle but were targeted players in the scheme to defraud and key links in the casual chain.

288. The marketing scheme involved using data to target high prescribers and training marketers to make misleading statements with the goal to increase high dose prescriptions which McKinsey and Opioid Marketing Enterprise Members knew were more likely to be abused. Enterprise Members knew that overdoses were expected and that such overdoses would lead to need for increased services.

289. Purdue's 2020 guilty plea acknowledged its role in using aggressive marketing to convince doctors to prescribe opioids unnecessarily, fueling the drug addiction crisis. McKinsey

[151] *Id.* ¶ 598.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

was the mastermind of marketing scheme following Purdue's 2007 guilty plea. McKinsey developed and helped implement these strategies.

290. In an October 26, 2009 presentation, "OxyContin – driving growth through stronger brand loyalty," McKinsey proposed tactics to turnaround declining sales, "[e]nhance loyalty to OxyContin among loyalist prescribers," "convert[ing] 'fence sitters' into more loyal OxyContin prescribers,"[152] and "protect OxyContin's market share[.]"[153] In other words, McKinsey proposed increasing sales by pushing both willing and reluctant physicians to prescribe more OxyContin.

291. McKinsey recommended segmenting prescribers and tailoring messages and tactics to different segments. For prescribers dubbed "Early Adopting Experts" and "Proactive Teachers," defined by a willingness to use extended-release opioids, including in patients who were not already using opioids, McKinsey urged emphasizing that its 7 tablet strengths provide flexibility to "tailor the dose" to customer needs.[154] Upon information and belief, this message aimed to encourage prescribers to initiate and maintain patients on OxyContin long-term by reminding them they could increase the dose as patients became tolerant with long-term us (rather than discontinue use when the drug lost its effectiveness).

292. Purdue adopted McKinsey's proposal.[155]

293. As detailed throughout, McKinsey and Opioid Marketing Enterprise Members were aware of the catastrophic injury inflected on the public by selling harmful, addictive opioid products. Yet when promoting opioids and engaging in doctor detailing, the Enterprise Members intentionally hid the potential for abuse and addiction by marketing OxyContin's 12-hour dosing as meaning that users only need to take OxyContin twice a day, thus requiring fewer pills.

294. It was foreseeable that this marketing strategy would lead to greater addiction because OxyContin wore off after 8 to 10 hours in many patients. Prescribing 12-hour dosing led

[152] *Id.* ¶ 603.

[153] *Id.*

[154] *Id.* ¶ 604.

[155] *Id.* ¶ 605.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

to "end of dose failure," which led to a vicious cycle that became "the perfect recipe for addiction."[156] As a result, what McKinsey marketed as "convenient" led to what was described as "a [d]escription of Hell."[157]

295. The marketing scheme worked. Nationwide, based on an analysis by the Los Angeles Times, more than 52% of patients taking OxyContin longer than three months are on doses greater than 60 milligrams per day—which converts to the 90 morphine equivalent dose that the CDC Guideline urges prescribers to "avoid" or "carefully justify."[158]

**Data Scheme: Use of Prescriber Data for Intentional Targeting of High Opioid Prescribers-Not Diversion Prevention**

296. McKinsey was an advisor to DEA registrants and Opioid Marketing Enterprise Members, who had a legal duty to guard against diversion and report suspicious orders of controlled substances. Rather than assisting in reporting suspicious orders, McKinsey used its position and access to detailed prescriber information to target high-volume prescribers to sell more opioids.

297. Distributors of controlled substances have a legal duty to report suspicious orders, and to report those that deviate substantially from a normal pattern and orders of unusual size and frequency. *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b). These obligations included a legal duty to maintain effective controls and procedures to guard against diversion of controlled substances and a legal duty to maintain a system to identify and report suspicious orders of controlled substances. *See* 21 C.F.R. §§ 1301.7(a) (b); 1301.74(b). Rather than advising their registrant clients on how to comply with their legal duties to maintain effective controls to guard against diversion and how to operate a system to identify and report suspicious orders, in furtherance of the scheme, McKinsey and the Opioid Marketing Enterprise Members used detailed data to target prescribers to increase the opioid market.

---

[156] *Id.* ¶ 607.

[157] *Id.* ¶ 608.

[158] *Id.* ¶ 608.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

298. Consistent with the Enterprise's purpose of increasing profit by deceptively marketing opioids, McKinsey was tasked with "Identifying Granular Growth Opportunities for OxyContin," conducting an "assessment of the underlying drivers of current OxyContin performance," identifying "key opportunities to drive near-term OxyContin performance," and developing "plans to capture priority opportunities."[159]

299. McKinsey received physician-level sales data to develop its marketing strategy to increase OxyContin performance after Purdue's 2007 guilty plea. Rather than using this access to the granular data to avoid diversion and to prevent Enterprise members from targeting prescribers with suspicious prescribing patterns, McKinsey used this information to help the Opioid Marketing Enterprise members push more opioids on high volume prescribers in furtherance of its schemes to defraud. The targets were chosen based on their history of prescribing high doses of opioids in large quantities.

300. One of the services the Enterprise used in furtherance of this scheme concerned the use of data to help Purdue meet its goals. McKinsey's analysis for the "Evolve to Excellence" proposal shows that it had detailed information from which it could discern, as could Purdue, whether a prescriber had problematic patterns suggesting operation as a "pill mill," including a shift to other opioids after OxyContin's reformulation. Yet, McKinsey urged Purdue to target, and seek to increase the prescribing of all prescribers from whom it perceived Purdue could obtain greater profits.

301. McKinsey found that Purdue did not "focus on the highest potential docs," measured both by the number of prescriptions and reimbursement considerations.[160] A McKinsey analyst urged McKinsey to recommend Purdue target "[l]iterally, at least all" prescribers in the top 20% of prescribers, "minus another few percent who are no sees[.]" McKinsey team lead Arnab Ghatak replied that "they probably have 20% no see[], but i'd also assume there are not many high writers that are no see."[161] ("No see" prescribers are prescribers who do not accept

---

[159] *Id.* ¶ 612.

[160] *Id.* ¶ 615.

[161] *Id.*



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

visits from pharmaceutical sales representatives. Thus, upon information and belief, McKinsey recognized that most of the highest volume prescribers, or "high writers" of prescriptions, were willing to entertain sales visits from sales representatives.)

302. The Opioid Marketing Enterprise used data for intentional targeting of high prescribers and not for diversion prevention. McKinsey advised Purdue to raise sales of Oxycontin by focusing on high dose sales and deceptively messaging to physicians that OxyContin would improve function and quality of life. McKinsey urged Purdue to maximize sales by dictating which prescribers its sales representatives would target. For example, McKinsey advised Purdue that it should take "specific actions" to increase sales of OxyContin, including "Prescriber Targeting" and "Turbocharg[ing] Purdue's Sales Engine."

303. McKinsey targeted not just doctors but also nurse practitioners and physician assistants, recommending Purdue "[d]ouble down on nurse practitioners and physician assistants . . . as they represent a growing market segmentation of prescribers."[162]

304. The Enterprise's scheme also explored ways to increase the amount of time sales representatives spent in the field increasing opioid sales, and prioritizing OxyContin in incentive compensation targets.[163]

305. By April 24, 2014, the plan was working and McKinsey reported that Purdue's "sales force is selecting an increasing percentage of high-value OxyContin prescribers as targets."[164]

306. McKinsey ensured Purdue would benefit from the lessons learned by other Enterprise members, stating that "its experience with other pharmaceutical companies suggests that such a comprehensive Sales transformation program takes nine months."[165] Likewise,

---

[162] *Id.* ¶ 617.

[163] *Id.* ¶ 618.

[164] *Id.* ¶ 619.

[165] *Id.* ¶ 620.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

McKinsey recommended physician targeting to other Enterprise members, including Endo and Janssen.[166]

307. By targeting physicians based on their prescribing patterns, the Opioid Marketing Enterprise was working toward the common purpose of deceptively convincing doctors to prescribe more opioids and thereby increase their own profits. By developing "Evolve to Excellence," which was implemented as a plan to "turbocharge" opioid sales, McKinsey advised that Purdue would see a greater return on its sales investment by focusing its targets, including on prescribers with alarming prescribing patterns that raised red flags they were writing "prescriptions" for non-medical use. The plan aimed at boosting sales of OxyContin by targeting the highest volume opioid prescribers, which McKinsey and the other members of the Opioid Marketing Enterprise knew and/or should have known would result in the expansion of the illicit opioid market.

308. The Enterprise sought to grow opioid sales to prescribers who raised red flags of diversion and orders it knew or should have known were likely to be diverted or fuel an illegal market. Purdue had a legal obligation not to target these prescribers; rather, it was obligated to report their conduct to law enforcement. Yet the Enterprise used access to prescriber data not to report diversion but to enhance diversion.

**<u>Pattern of Racketeering Activity</u>**

309. McKinsey together with the other Opioid Marketing Enterprise Members engaged in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription painkiller market—through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain. As a unique consulting entity with knowledge of both the addictive properties and abuse potential of opioids and with access to data regarding internal prescribing behaviors of its targets, McKinsey perpetrated a number of fraudulent schemes using the mails and wires, including advising Purdue to market more opioids, in higher doses, to high volume prescribers while helping Purdue avoid mandatory prescriber

[166] *Id.* ¶ 621.



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

education regarding the risks of opioids. McKinsey fueled the epidemic alongside its clients. Through targeted marketing that McKinsey worked to develop, "turbocharge," and implement, McKinsey substantially contributed to an explosion in the use of opioids across the United States. McKinsey is an outfit that is engaged in and affects interstate commerce because the company advised opioid manufacturers on the sale of opioid products across the United States, as alleged herein.

310. The Opioid Marketing Enterprise Members devised and knowingly carried out this illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute, and non-cancer pain. They knew that these representations deviated from the FDA-approved use of these drugs and were not supported by actual evidence. The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, deceive consumers, prescribers, regulators, Seattle, and other intended victims and they used the U.S. Mail and interstate wire facilities with the specific intent to advance, and for the purpose of executing, their illegal scheme.

311. By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, the Opioid Marketing Enterprise Member engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

312. To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members hid from the consumers, prescribers, regulators, and Seattle: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

313. The Opioid Marketing Enterprise Members with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

314. Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This coordination was accomplished via their relationships with each other and via McKinsey's relationships and contacts with key opioids manufacturers.

315. The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Seattle, while simultaneously generating billion-dollar revenues and profits for the Opioid Marketing Enterprise Members. The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

316. The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity. McKinsey in particular used mail and wire transmission, directly or indirectly, in furtherance of this scheme by transmitting deliberately false and misleading statements to prescribers and the public.

317. McKinsey had a specific intent to deceive and defraud prescribers, regulators and Seattle. For example, as alleged above, McKinsey made repeated and unequivocal statements through the mails and wires that were false and misleading. McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and likewise reduce stress and isolation.

318. Similarly, they caused to be transmitted through the mails and wires false and misleading statements regarding the addiction potential of opioids. Moreover, McKinsey had direct involvement in marketing statements and thus caused the statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

319. The marketing scheme is especially egregious since the public relies on physicians as a position of trust and authority in the community regarding their health and well-



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

being. McKinsey intentionally deceived physicians regarding the abuse potential of opioids. It intended prescribers and the public to rely on its false statements. McKinsey intended reliance on these false statements as it was their goal for doctors to prescribe more and higher quantities of these dangerous pills to the public. This scheme was therefore reasonably calculated to deceive not only persons of ordinary prudence and comprehension but also educated physicians in a place of high trust in the community.

**Predicate Acts**

320. To carry out, or attempt to carry out, the scheme, the Enterprise Members, each of whom is a person associated-in-fact with the Enterprise, did knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

321. Specifically, the Enterprise Members have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

322. The multiple acts of racketeering activity which the Enterprises Members committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

323. The racketeering activity was made possible by the Enterprise's regular use of the facilities, services, distribution channels, and employees of the Enterprise Members.

324. The Opioid Marketing Enterprise Members participated in the schemes by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

325. The Enterprise Members used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their schemes through common misrepresentations, concealments, and material omissions.

326. In devising and executing the illegal schemes, the Opioid Marketing Enterprises Members devised and knowingly carried out a material scheme and/or artifice to defraud Seattle


HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

and prescribers and to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

327. For the purpose of executing the illegal schemes, the Enterprise Members committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal schemes.

328. The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to the conduct described in the Factual Allegations section of this Complaint, and:

329. Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

330. Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

331. The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments, and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute, and non-cancer pain, with the goal of profiting from the increased sales of the Opioid Marketing Enterprise Members' drugs that occurred because consumers, prescribers, regulators, and Seattle relied on the Opioid Marketing Enterprise Members' misrepresentations. These uses of the U.S. Mail or interstate wires included, inter alia:



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

332. Marketing materials about opioids and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, and published across the country, including to Seattle;

333. Written representations and telephone calls among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of opioids for chronic, long-term pain generally;

334. E-mails, telephone calls, and written communications among the Opioid Marketing Enterprise Members agreeing to or implementing the opioids marketing scheme;

335. Communications among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members and the media regarding the publication, drafting, and dissemination of treatment guidelines as part of the Opioid Marketing Enterprise; Written and oral communications directed to prescribers, the public, and Seattle that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

336. Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

337. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities are not obtainable (e.g., each time a McKinsey trained marketer "calls" or reached out to a physician using the mails or wires in furtherance of the marketing scheme). Because the Opioid Marketing Enterprise Members disguised their participation in the Enterprise, and worked to keep the Enterprise's existence secret, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy. Seattle has, however, described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, McKinsey engaged in fraudulent activity in furtherance of their scheme.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

338. Below, Seattle also describes examples of occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, and Seattle, and how those acts were in furtherance of the scheme.

| FROM | TO | DATE | DESCRIPTION |
|---|---|---|---|
| Purdue | Prescribers and Plaintiff | 2007 | Statements that pain relief from opioids improves patients' function and quality of life in advertising and a book. |
| Purdue | Prescribers | Continuous | Telephonic and electronic communications by sales representatives indicating that opioids improve patients' function. |
| Purdue | FDA advisory committee | September 2009 | Presentation prepared by McKinsey indicating that Purdue's reformulated OxyContin will deter abuse. |
| Purdue | Prescribers and Plaintiff | 2010 onwards | Statements that the reformulated OxyContin will deter abuse and therefore doctors can continue to safely prescribe opioids. |
| Purdue | Prescribers and Plaintiff | 2010-2020 | Statements from Purdue at McKinsey's direction that opioids can provide "freedom," "peace of mind," and give patients "the best possible chance to live a full and active life." |
| Purdue | Prescribers and Plaintiff | Advertising produced in 2016 | Advertising from Purdue that "We sell hope in a bottle." |
| Purdue | Prescribers and Plaintiff | 2010 onwards | Statements that OxyContin's 12-hour dosing would permit patients to take OxyContin just twice a day, thus requiring fewer pills. |
| Purdue | Prescribers and Plaintiff | 2013 onwards | Statements from Purdue at McKinsey's direction that OxyContin allowed physicians to "Individualize the Dose" and that the dose of OxyContin can safely be increased or tailored as patients build tolerance. |
| Endo | Prescribers and Plaintiff | 2009 | Statements made on an Endo-sponsored website, PainKnowledge.com, indicating that patients who take opioids as prescribed usually do not become addicted. |
| Endo | Prescribers and Plaintiff | 2009 | Statements made on another Endo-sponsored website, PainAction.com, indicating that most chronic pain patients do not become addicted to opioid medications. |
| Endo | Prescribers and Plaintiff | Various | Statements in pamphlets and publications sponsored by Endo indicating that most people who take opioids for pain relief do not develop an addiction. |



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

| | | | |
|---|---|---|---|
| Endo | Prescribers and Plaintiff | Various | Statements made on the Endo-run website, Opana.com, indicating that opioid use does not result in addiction. |
| Endo | Prescribers and Plaintiff | Various | Statements made on the Endo-run website, Opana.com, indicating that opioid dependence can be addressed by dosing methods such as tapering. |
| Endo | Prescribers and Plaintiff | Various | Statements made on its website, PainKnowledge.com, that opioid dosages could be increased indefinitely. |
| Endo | Prescribers and Plaintiff | Various | Statements made in a publication entitled "Understanding Your Pain: Taking Oral Opioid Analgesics" suggesting that opioid doses can be increased indefinitely. |
| Endo | Prescribers | Various | Electronic and telephonic communications to its sales representatives indicating that the formula for its opioids is "crush resistant." |
| Endo | Prescribers and Plaintiff | 2007 | Statements that pain relief from opioids improves patients' function and quality of life in advertising and a book. |
| Endo | Prescribers | Various | Telephonic and electronic communications by its sales representatives indicating that opioids will improve function. |
| Janssen | Prescribers and Plaintiff | Various | Statements on its website, PrescribeResponsibly.com, indicating that concerns about opioids are exaggerated. |
| Janssen | Prescribers and Plaintiff | 2009 | Statements in a 2009 patient education guide claiming that opioids are rarely addictive when used properly. |
| Janssen | Prescribers and Plaintiff | 2009 | Statements including on a 2009 Janssen-sponsored website promoting the concept of opioid "pseudoaddiction." |
| Janssen | Prescribers and Plaintiff | Various | Statements on its website, PrescribeResponsibly.com, advocating the concept of opioid "pseudoaddiction." |
| Janssen | Prescribers and Plaintiff | Various | Statements on its website, PrescribeResponsibly.com, indicating that opioid addiction can be managed. |
| Janssen | Prescribers and Plaintiff | 2009 | Statements in its patient education guide mischaracterizing the risks associated with limiting the dosages of pain medicines. |
| McKinsey | Purdue (with prescribers as the intended target) | July 18, 2013 | Discussion of McKinsey plan to increase calls to doctors' offices to fraudulently promote OxyContin, including via "phone, video and even Google like proprietary tools."[167] |

[167] *See* Master Complaint at ¶ 653.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

| | | | |
|---|---|---|---|
| McKinsey | Purdue (with prescribers as the intended target) | April 24, 2017 | Plan to promote OxyContin to "no-see" physicians through "remote interactions" including presenting "brand interaction and materials" "over the phone/internet."[168] |
| McKinsey | Internal | July 14, 2013 | Internal emails interpreting the "Purdue situation" and discussing OxyContin sales strategy including sales benchmarks and "focus on the highest potential docs."[169] |
| McKinsey | Purdue (with prescribers as the intended target) | September 23, 2013 | Evolve 2 Excellence PowerPoint planning execution of the scheme and discussing targeted performance metrics including "sales management calls per day, calls per year and adhering to the target list."[170] |
| McKinsey | Purdue | July 30, 2013 | Presentation showing "Scope of potential OxyContin growth opportunities" with proposed process including "Generate target list" and using "Reps/DMs [to] perform call planning (including refining target list)."[171] |

339. Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud consumers, prescribers, regulators, Seattle, and other intended victims.

340. These were not isolated incidents. Instead, the Opioid Marketing Enterprise Members engaged in a pattern of racketeering activity by committing thousands of predicate acts in a five-year period, in the form of mail and wire fraud, and there remains a threat that such conduct will continue in the future.

341. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, and Seattle. The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and

---

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the opioid distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

342. Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

343. The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and Seattle. Each separate use of the U.S. Mail and/or interstate wire facilities employed by the Opioid Marketing Enterprise was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, and Seattle. The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

344. Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

345. As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

346. The Opioid Marketing Enterprise Members' violations of law and pattern of racketeering activity directly and proximately caused Seattle injury in their business and



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially, and foreseeably caused an opioid epidemic. The injuries of Seattle, as described herein, were not unexpected, unforeseen, or independent. Rather, as Seattle alleges, the Opioid Marketing Enterprise Members as a whole and McKinsey in particular knew that the opioids were dangerous in the treatment of long-term chronic, non-acute, and non-cancer pain, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry out the Opioid Marketing Enterprise's fraudulent scheme, thereby increasing sales of their opioid products.

347. It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose and the injuries that occurred as a result.

**The Enterprise Was Well Aware of Risks of Abuse Before It "Turbocharged" its Marketing Scheme**

348. These devastating results were eminently foreseeable by the Opioid Marketing Enterprise Members.

349. When Purdue pleaded guilty in 2007, it was evident that Purdue's behavior and excessive prescribing was directly linked to a drug addiction crisis that caused severe and extensive damage to America. Purdue's methods included "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids – frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

350. McKinsey cannot deny knowledge regarding Purdue's 2007 guilty plea. At that point, McKinsey knew that opioids were addictive. McKinsey knew that OxyContin was being widely abused and causing harm to people and entities like Seattle. And McKinsey knew that Purdue had been fraudulently marketing OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. And yet, years later, in 2013, McKinsey orchestrated a scheme to



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

continue to aggressively promote opioids despite knowledge that people were still dying from overdoses.

351. Thus, McKinsey continued to add fuel to this fire by persisting in aggressively marketing to physicians and continuing to fuel the opioid crisis after Purdue's guilty plea. It was foreseeable that continuing to do so would devastate American communities.

352. Similarly, news stories across the nation reported additional consequences of wide scale opioid addiction: needles littered around public property, posing costs to the governments and danger to residents.

353. The foreseeability of the abuse and need for additional services that would be required following the misleading marketing and increased prescribing and use of high dose opioids is also evidenced by McKinsey's attempt to put a price tag on overdoses. McKinsey suggested payment amounts for event-based contracts: $6,000 to $15,000 (paid to health insurers for increased medical services). Indeed, McKinsey was well aware that increased prescriptions would lead to overdoses and to an additional financial burden for social and health services.

354. McKinsey is liable for its successful efforts to increase OxyContin sales after Purdue's 2007 guilty plea for misbranding the drug. Indeed, McKinsey's focus on increasing opioid sales after Purdue's guilty was incendiary to escalating and perpetuating the opioid epidemic by: (a) using data to specifically target high volume prescribers; (b) persuading sales of higher doses of opioids; (c) tailoring marketing messages to conceal their addictive principles; and (d) by reducing the training of sales representatives.

355. In 2012, when the consent decree expired (which obligated Purdue to submit annual compliance reports regarding its marketing), McKinsey helped Purdue reengage in its nefarious conduct of targeting and deceiving doctors about the abuse potential of opioids.

356. After Purdue's guilty plea, McKinsey identified physicians—that had already been influenced by Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a massive marketing push to sell more OxyContin. McKinsey monitored the prescription behaviors of individual doctors and utilized the prescriber-level data and urged Purdue to allocate its time and resources to high prescribing physicians.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

357. By November 2013, McKinsey had obtained the physician-level data it had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them.

358. In 2013, Project Turbocharge began. McKinsey proposed Project Turbocharge, a marketing strategy to increase opioids sales by hundreds of millions of dollars annually. With McKinsey's assistance, Purdue trained its sales representatives to operate using McKinsey's strategy for selling OxyContin. It is not coincidental to the Enterprise scheme that as soon as the constraints associated with its guilty plea and consent agreement ended, McKinsey assisted Purdue in "turbocharging" sales.

359. While McKinsey was pushing hard to turbocharge and promote the sale of opioids, it anticipated and expected that people would die from opioid overdoses. It acknowledged this when in 2017, it proposed that Purdue pay health insurers or other entities in the distribution chain rebates "for every OxyContin overdose attributable to pills they sold."

360. McKinsey cannot deny that it was not aware of the abuse and overdose potential of opioids when it provided estimates for the future costs of overdose or opioid use disorder events.

361. McKinsey and the other Opioid Marketing Enterprise Members marketed a product, through intentionally deceptive means, that it knew would result in consumer deaths and harm to Seattle. This is not an attenuated causal chain. Rather, aggressively marketing to high prescribing individuals, and training to not fully disclose the risk of abuse, were integral parts of the marketing scheme. Deceptive messaging to targeted prescribers who were likely to prescribe more pills in a dose with an anticipated abuse potential was part and parcel of the scheme to defraud.

362. As a result, Seattle has shouldered the burden of these anticipated increased services and harm to business and property that are inherently tied to opioid abuse and misuse, and both the increased services and harms were reasonably and actually expected from increased prescribing.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

363. The Enterprise's goal was to increase opioid prescribing, and the Enterprise Members knew that doing so would also result in the need for increased medical services. It was also foreseeable that increased prescriptions would also result in increased costs to Seattle and communities throughout the United States.

364. But for the increase in prescribed opioids, Seattle would not have to expend additional resources or suffered other harm to business and property as a result of harms associated with opioid addiction. The Enterprise persisted in targeting prescribers to prescribe high doses of opioids and knew that doing so would result in adverse health and social outcomes, including overdoses, neo-natal complications, harm to communities like Seattle, hazardous waste in communities, as well as and increased expenditures on services to combat such ill effects.

**Seattle's Business and Property Have Been Damaged by the Enterprise's RICO Violations**

365. The Opioid Marketing Enterprise's misleading marketing and failure to prevent prescription opioid diversion damaged Seattle. In addition to medical services, the Opioid Marketing Enterprise's misconduct has contributed to a range of social problems, including violence and delinquency. Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair. These very harms were acknowledged by McKinsey during the course of this fraudulent scheme. As a result, more and more of the resources of Seattle were being devoted to responding to the opioid epidemic.

366. Notably, Seattle has experienced vast harm to business and property directly, proximately, and foreseeably caused by the racketeering enterprise. The full extent of Seattle's damage cannot be captured fully in this pleading prior to expert analysis and discovery. Below are some discrete examples that demonstrate the common and typical universal harm to Seattle and the specific types of harm foreseeably caused by the Opioid Marketing Enterprise.

367. Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme has injured Seattle in the form of substantial losses of money



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

and property that logically, directly and foreseeably arise from the opioid epidemic. The injuries to Seattle, as alleged throughout this Complaint, and expressly incorporated herein by reference, include:

a. Costs associated with hazardous waste and removal of such waste from communities of Seattle, including on real property of Seattle;

b. Costs for providing healthcare and medical care, including additional therapeutic care, prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

c. Costs of training first responders in the proper treatment of drug overdoses;

d. Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

e. Costs associated with emergency responses by first responders to opioid overdoses;

f. Costs for providing mental health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

g. Costs associated with the injuries to the health and welfare of the residents who reside in the jurisdiction of Seattle caused by the opioid epidemic;

h. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation; and

i. Losses caused by the diversion of revenue to address the opioid epidemic that would otherwise have been used to provide other services.

368. The injuries to Seattle were directly and proximately caused by these racketeering activities because they were the logical, substantial, and foreseeable cause of the injuries to Seattle. But for the opioid epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Seattle would not have lost money or property, and the health and welfare of citizens would not have been harmed.

369. Seattle has been injured by the Enterprise's conduct, and such injury would not have occurred but for the predicate acts, which also constitute acts taken in furtherance of the



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

conspiracy pursuant to Section 1962(d). By working to expand the opioid market, fraudulently concealing the abuse potential of opioids, targeting high volume prescribers, and deceiving prescribers and the public in order to allow opioids to continue to remain on the market, the Enterprise caused the expansion of opioid prescribing and thus a large number of people across the United States, and in Seattle's communities, to become addicted to opioids, thereby forcing Seattle to expend, time, money and resources to address the opioid epidemic that McKinsey and the Enterprise created through their conduct. Indeed, McKinsey intentionally deceived doctors and public health workers in order to continue to grow the opioid market. The repeated fraudulent misstatements by the Opioid Marketing Enterprise Members contributed to an explosion in the use of opioids across the country.

370. Seattle was a direct victim of McKinsey's misconduct. The Enterprise displayed a wanton disregard for public health and safety by intentionally deceiving doctors about the addiction potential of opioids and by marketing higher doses to physicians. The harm created by McKinsey required Seattle to expend financial and other resources to mitigate the health crisis of opioid misuse and addiction. The expansion of the opioid market was the goal of the Enterprise and was critical to its success. Therefore, the harm suffered by Seattle to its property and its forced expenditure of resources beyond ordinary costs of services to combat the opioid epidemic, was directly foreseeable, and in fact, and intentional result of the Enterprise's misconduct. In fact, McKinsey anticipated overdose events and actually estimated price premiums on these expected overdose events. McKinsey knew that the products it was marketing were highly addictive and could lead to deadly overdoses yet continued to "turbocharge" sales by fraudulently pushing the product on doctors through its deceptive marketing scheme.

371. The creation and implementation of the marketing scheme that McKinsey developed and deployed through the Opioid Marketing Enterprise, directly harmed Seattle by imposing costs on its businesses and properties. Seattle's injuries are not solely the result of routine government expenses. Instead, as a result of the Enterprise's misconduct, Seattle has been and will be forced to go far beyond what a governmental entity might ordinarily be expected to pay to enforce laws and to promote the general welfare in order to combat the opioid



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

epidemic, whose primary origins were in prescription opioids administrated by prescribers to whom McKinsey directed the targeting of the marketing scheme. This includes providing new programs and new services as a direct result and in direct response to the Enterprise's misconduct. In addition, Seattle has suffered loses to its property as a direct result of the kind of inevitable consequences of the drug addiction and criminal behavior that McKinsey predicted. As a result of the conduct of the Enterprise, Seattle has incurred and will continue to incur costs that far exceed the norm.

372. The injuries to Seattle were directly and proximately caused by these racketeering activities because they were the logical, substantial, and foreseeable cause of the injuries to Seattle. But for the opioid epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Seattle would not have lost money or property, and the health and welfare of Seattle residents would not have been harmed. Moreover, McKinsey's internal documents show that it in fact foresaw many of the harms that resulted from its conduct.

373. There are no intervening acts or parties that could interrupt the causal chain between McKinsey's mail and wire fraud and Seattle's injuries. McKinsey, in furtherance of the Enterprise's common purpose, caused to be made false and misleading statements directly to prescribers (who consumers rely on to provide health advice), patients, and Seattle. Prescribers are not a break in the causal chain. Instead, the Enterprise Members as a whole, and McKinsey in particular, intentionally targeted doctors and sought to deceive them. That the doctors were then deceived and behaved as the Enterprise wanted, prescribing more and more opioids, was the purpose of the scheme, not an intervening cause.

374. The Enterprise's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Seattle, and Seattle is entitled to bring this action for three times their actual damages, as well as for injunctive/equitable relief, costs and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**SECOND CAUSE OF ACTION:**

**PUBLIC NUISANCE**
**RCW CHAPTER 7.48**

375. Seattle incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

376. RCW 7.48.120 provides that:

> Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property.

377. Under Washington law, "a public nuisance is one which affects equally the rights of the entire community or neighborhood, although the extent of the damage may be unequal." RCW 7.48.130. Furthermore, an "actionable nuisance" encompasses "whatever is injurious to health or indecent or offensive to the senses." RCW 7.48.010.

378. Through the actions described above, McKinsey has contributed to and/or assisted in creating and maintaining a condition that is unreasonable and harmful to the health of Seattle citizens and/or interferes with the comfortable enjoyment of life in violation of Washington law.

379. Rates of opioid abuse and opioid-related overdose have skyrocketed in Seattle. Locations such as offices of high-prescribing health care practitioners and the pharmacies at which their patients fill opioid prescriptions attract drug dealers and serve as a source of diversion. Similarly, abandoned homes and some public spaces have attracted drug traffic, rendering them and the surrounding private property less safe or, in many cases, entirely unsafe. Household medicine cabinets have become outlets for diversion and abuse due to over-saturation of the market, and the foreseeable failure to safely dispose of old opioid prescriptions. The indiscriminate distribution of opioids has also created an abundance of drugs available for criminal use and fueled a wave of addiction, abuse and injury. It has further resulted in the creation of additional illicit markets in other opiates, particularly heroin and fentanyl, which



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

many users are forced to turn to when they have become dependent on, but are no longer able to obtain or afford, prescription opioids.

380. McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and abused. Its actions played a central and critical role in causing health care providers to access and improperly prescribe millions of opioids that were not medically necessary. Indeed, but for McKinsey's actions, opioid use could not and would not have become so widespread, and the massive public health crisis that now exists would have been substantially mitigated.

381. The resulting public nuisance is both substantial and unreasonably burdensome to Seattle agencies, imposing upon them a significantly greater demand for emergency services, law enforcement, addiction treatment, and social services, all while draining City and local resources. The nuisance has caused and continues to cause devastating harm to communities across Seattle that far outweighs any conceivable offsetting benefit.

382. Moreover, the public nuisance and its associated financial and non-economic losses were foreseeable to McKinsey, who knew or should have known that its conduct would exacerbate opioid abuse and create such a nuisance.

383. Seattle residents have a right to be free from conduct that endangers their health and/or safety, and the wellbeing of individuals in Seattle is a matter of great public interest and legitimate concern to the City. McKinsey's actions interfered with the enjoyment of this public right and have injured—and will continue to injure—Seattle residents, including not only the individuals who use, have used or will use opioids, but also the families and communities at large that are subjected to the many harmful indirect effects of rampant opioid use and abuse.

384. Opioids are abused not only in private homes, but on the streets of Seattle, in public parks, and in municipal buildings. Addicts who have lost stable housing have crowded into encampments on Seattle property, with the byproducts of their abuse, needles, and other waste, littering Seattle streets. Opioid-caused medical emergencies and related disturbances also occur regularly on, and detract from the intended uses of, Seattle property. Much opioid-related



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

criminal activity takes place on Seattle's streets and rights of way. In these ways, and many more, Seattle's real property interests have been severely impacted by McKinsey's conduct.

385. Pursuant to RCW 7.48.020 and 7.48.180, Seattle seeks an order that provides for the abatement of the public nuisance McKinsey created, awarding damages equal to the cost of abatement, and enjoining McKinsey from future violations of RCW Chapter 7.48.

**THIRD CAUSE OF ACTION:**

**PUBLIC NUISANCE**
**WASHINGTON COMMON LAW**

386. Seattle incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

387. McKinsey has contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of Seattle residents and interferes with the comfortable enjoyment of life in violation of Washington law.

388. The public nuisance created by McKinsey's actions is substantial and unreasonable—it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any potential offsetting benefit.

389. McKinsey knew or should have known that its conduct would create a public nuisance.

390. McKinsey's actions were, at the least, a substantial factor in opioids becoming widely available and widely used. Without McKinsey's actions, opioid use would not have become so widespread, and the enormous public health crisis that now exists would have been substantially mitigated.

391. The health and safety of individuals in Seattle, including those who use opioids as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to the City.

392. Opioids are abused not only in private homes, but on the streets of Seattle, in public parks, and in municipal buildings. Addicts who have lost stable housing have crowded into encampments on Seattle property, with the byproducts of their abuse, needles, and other



HAGENS BERMAN
1301 Second Avenue, Suite 2000 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

waste, littering Seattle streets. Opioid-caused medical emergencies and related disturbances also occur regularly on, and detract from the intended uses of, Seattle property. Much opioid-related criminal activity takes place on Seattle's streets and rights of way. In these ways, and many more, Seattle's real property interests have been severely impacted by McKinsey's conduct.

393. Seattle seeks an order that provides for the abatement of the public nuisance McKinsey has created, enjoins McKinsey from creating future nuisances, and awards Seattle damages equal to the cost of abatement.

**FOURTH CAUSE OF ACTION:**

**NEGLIGENCE**

394. Seattle incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

395. Under Washington law, a cause of action for negligence arises when a defendant owes a duty to a plaintiff and breaches that duty, proximately causing a resulting injury.

396. McKinsey, through its work with Purdue and other opioid manufacturers, owed Seattle duties, including but not limited to, a duty to not deceive, encourage, and facilitate the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health, safety, and welfare.

397. McKinsey also owed such a duty as a "Covered Person" under the Corporate Integrity Agreement.

398. McKinsey breached this duty by, for years, devising and assisting opioid manufacturers in implementing an aggressive sales and predatory marketing campaign, which promoted misleading claims regarding prescription opioids to significantly bolster the amount of opioids prescribed and distributed throughout Seattle and elsewhere.

399. McKinsey's conduct was a proximate cause of increased opioid use and abuse along with the inevitable and foreseeable resulting consequences and public harms. As a direct and proximate cause of McKinsey's unreasonable and negligent conduct, Seattle has suffered and will continue to suffer harm, and is entitled to damages in an amount to be determined at trial.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**FIFTH CAUSE OF ACTION:**

**CIVIL CONSPIRACY**

400. Seattle incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

401. Under Washington common law, a civil conspiracy occurs when (1) two or more people combine to accomplish an unlawful purpose, or combine to accomplish a lawful purpose by unlawful means, and (2) the conspirators enter into an agreement to accomplish the conspiracy.

402. McKinsey and Purdue engaged in a civil conspiracy in their unlawful marketing of opioids and/or efforts to boost the sale of opioids in Seattle. McKinsey entered into an agreement with Purdue to increase the sales of OxyContin by unfair, deceptive, and unconscionable means, in violation of Washington and federal law. McKinsey and Purdue specifically employed unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of the United States Department of Health and Human Services for the five years in which Purdue was subject to a Corporate Integrity Agreement, after Purdue pled guilty to criminal misbranding in 2007.

403. The conspiracy was the product of agreement between McKinsey and Purdue, who were operating in close collaboration. When McKinsey's role in the conspiracy threatened to be exposed, upon information and belief, it took efforts to conceal its participation by attempting to destroy inculpating emails and files.

404. McKinsey's conspiracy, and McKinsey's actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

405. McKinsey's actions demonstrated both malice and also aggravated and egregious fraud. McKinsey engaged in the conduct alleged herein with a conscious disregard for the safety of other persons, even though that conduct had a great probability of causing substantial harm. McKinsey's fraudulent wrongdoing was done with a particularly gross and conscious disregard.

406. But for the conspiracy, Seattle would not have expended millions of dollars to address and abate the public health crisis the conspiracy has foreseeably engendered in Seattle.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

407. As a direct and proximate cause of the conspiracy, Seattle has been injured and seeks an order enjoining any further operation of the civil conspiracy, damages in an amount to be determined at trial, and all other relief provided by law.

**PRAYER FOR RELIEF**

WHEREFORE, Seattle prays that the Court:

a. Enter judgment against McKinsey and in favor of Seattle;

b. Award compensatory damages in an amount sufficient to compensate Seattle fairly and completely for all damages, treble damages, pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

c. Enter orders and procedures to abate the nuisance created by McKinsey's wrongful conduct;

d. Enjoin McKinsey from continuing or repeating the wrongful conduct alleged herein;

e. Award Seattle its costs of suit, including reasonable attorneys' fees as provided by law; and

f. Award such further and additional relief as the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Seattle requests a trial by jury on all issues so triable.



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Dated this 31st day of October, 2022.

Respectfully submitted,

By: [signature]

Ann Davison, WSBA # 35776
City Attorney
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Telephone: (206) 684-8200
Ann.Davison@seattle.gov

OF COUNSEL:

By: /s/ Steve W. Berman
Steve W. Berman, WSBA # 12536
By: /s/ Emilee N. Sisco
Emilee N. Sisco, WSBA # 50273
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 580-6559
steve@hbsslaw.com
emilees@hbsslaw.com

Ben M. Harrington
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

All out-of-state counsel to be admitted *pro hac vice*.